# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-1517

_____

| | | |
|---|---|---|
| David Riehm; Colleen Riehm, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| John Engelking, in his individual | * | |
| capacity and his official capacity as | * | |
| Middle and High School Principal of | * | |
| Cook County Public Schools, | * | |
| Independent School District Number | * | |
| 166; Ann Mershon, in her individual | * | |
| capacity and her official capacity as a | * | |
| public school teacher employed by | * | |
| Independent School District Number | * | Appeal from the United States |
| 166; Independent School District | * | District Court for the |
| Number 166, a political subdivision | * | District of Minnesota. |
| of the State of Minnesota, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Steven Diercks, in his individual | * | |
| capacity and his official capacity as a | * | |
| social worker employed by the | * | |
| Department of Public Health and | * | |
| Social Services of Cook County, | * | |
| Minnesota; Ann DeBevec, in her | * | |
| individual capacity and her official | * | |
| capacity as a social worker employed | * | |
| by the Department of Public Health | * | |
| and Social Services of Cook County, | * | |
| Minnesota, | * | |

Defendants - Appellees,      *
*
Deputy Joseph Zallar, in his      *
individual capacity and his official      *
capacity as a deputy sheriff employed      *
by Cook County, Minnesota,      *
*
Defendant,      *
*
Cook County, a political subdivision      *
of the State of Minnesota,      *
*
Defendant - Appellee,      *
*
Officer Christopher Thostenson, in his      *
individual capacity and his official      *
capacity as a Minnesota State Patrol      *
Officer assigned to the Northeast      *
Division,      *
*
Defendant.      *

_____

Submitted:  November 13, 2007
Filed:  August 15, 2008

_____

Before MURPHY, HANSEN and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

David Riehm was a high school student who wrote an essay detailing a fantasy murder-suicide inspired by the school shooting that took place at Columbine High

School in Littleton, Colorado. He left the essay with his teacher, who read it and reported it to law enforcement. He was taken from his home in Cook County, Minnesota, by court order, underwent a psychiatric evaluation and was released after seventy-two hours. He and his mother, Colleen Riehm, brought this lawsuit against Cook County and two of its employees, Steven Diercks and Ann DeBevec (collectively, the "county defendants"), seeking damages on the grounds that David's detention violated his First Amendment right to free speech and Fourth Amendment right to be free from unreasonable seizures and Colleen's Fourteenth Amendment right to familial integrity, and that the county's failure to pay David's medical bills violated Colleen's Fourteenth Amendment substantive due process right, as well as Minnesota state law. The district court[1] granted the county defendants' motions for dismissal and summary judgment, and the Riehms appeal.[2] For the reasons discussed below, we affirm.

## I.    BACKGROUND

In January 2005, David was seventeen years old and a student at Cook County High School in Grand Marais, Minnesota. During Ann Mershon's creative writing class, David wrote three essays that Mershon found disturbing, the last of which Mershon viewed as a personal threat.

David's first essay, "Poor John Redfield," written in the fall of 2004, described a student who had a nocturnal emission, fell and penetrated his anus on a toy, slipped on his own blood and was run over by a bus, which collapsed his head "in a red misty

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]The Riehms voluntarily dismissed their claims against Principal John Engelking, school teacher Ann Mershon, Independent School District Number 166, Cook County Deputy Sheriff Joseph Zallar, and Minnesota State Patrol Officer Christopher Thostenson.

explosion." According to David, the moral of the story was "don't have wet dreams or you'll die a horrible death." Mershon returned the essay with comments indicating that she found it offensive and wanted him to make changes.

David wrote his second essay, consisting of two parts, "View Number One" and "View Number Two," around the same time. In "View Number One," he wrote that he usually thought "about life in general, and you know, life is not g rated. There is violence, language, sexual content everywhere." He stated, "Violence is on the news, that doesn't mean its [sic] pornography." In "View Number Two," he criticized an "old fashioned, narrow minded, uncreative, paranoid, . . . jealous" English teacher pejoratively named "Mrs. Cuntchenson." He described her as an "old cranky teacher," with "absolutely no comprehension whatsoever of life." He wrote, from her perspective, "If a particular student writes about a violent or gory story, then of course I automatically assume that they have a problem with obsessive focus on sex and potty language." Mershon read the essay and informed David that they should talk about it. Mershon discussed the first two essays with David's mother, Colleen, at a conference and believed that the issue had been resolved.

David titled his third essay "Bowling for Cuntchenson." The essay called Mrs. Cuntchenson a "bitch[]" who is "way out of line." The student-narrator is expelled from Mrs. Cuntchenson's English class and dreams about a smoking gun "next to a clump of blood matted hair. The hair belonged to an unrecognizable head." The student wakes up, packs his bag and begins an "interesting day." He eats alone in the cafeteria "like a prisoner sentenced to death. Sitting alone, trying to force down their [sic] last meal into their [sic] nervously wrecked and knotted stomach, knowing all to [sic] well their [sic] wasted life will be ended shortly." In Mrs. Cuntchenson's class, he finds himself "unable to free myself from her satanic grip" and is kicked out of her class, leaving in a "fit of rage," "ready to explode out like a million shards of glass in search of flesh to mangle." He stumbles into a church and bumps into a gun taped underneath a pew. "Maybe it was a sign, a sign from god, a sign that I should do

something. Then I got the most horrific idea that I had ever had, but yet, maybe it was the best." The student then, "on a mission," returns to school where the other students had "no idea of what was about to happen." The student raises the gun, aims at Mrs. Cuntchenson and smirks at the "wide eyed look horror [sic] in her face." He winces "as the bullet replaced her left eye. In an instant a red mist was produced from the wound, followed by a stead [sic] flow of blood, tissue, and bone fragments. I felt the warm mist speckle onto my face. The splatter distance was incredible." The student licks his lips and tastes "[b]lood too, her blood, her blood that I had spilt." The student then commits suicide and concludes, "It was all totally worth it." The narrator fades to a movie theater, where he leaves with his friends and discusses the movie they just watched, presumably *Bowling for Columbine*.[3]

Mershon required students to submit essays in a personal folder she established for each student in a filing cabinet in her classroom. David alleges that he completed his third essay in early October before placing it in his folder in the filing cabinet. Mershon claims she did not see David's third essay until the weekend of January 22 and 23, 2005. When she read it, she felt threatened, scared and hurt. She reported her concerns to the school principal, John Engelking. Engelking suspended David on Monday, January 24. Engelking called Colleen to inform her of David's suspension.

Engelking and Mershon gave David's essays to Cook County Deputy Sheriff Joseph Zallar. Zallar took a statement from Mershon and gave her statement and the essays to Assistant Cook County Attorney Michael Boese and to the Cook County Department of Health and Human Services. Steven Diercks, a Cook County social worker, discussed David's essays with Zallar and Boese. Diercks opened a "Child Welfare Assessment" case with the approval of his supervisor, Ann DeBevec.

---

[3]*Bowling for Columbine* is a movie released in 2002 that advocates gun control and includes security-camera footage of the massacre at Columbine High School that occurred on April 20, 1999. Roger Ebert, *Reason Remains at Arms Length in "Columbine,"* Chi. Sun-Times, Oct. 18, 2002, at 24.

On January 25, Diercks prepared two petitions, one for a child in need of protection or services ("CHIPS petition"), and the other an ex parte petition for emergency protective care ("ex parte petition"). Diercks based his CHIPS petition on David's essays, particularly the third essay's "veiled threat" and "many threats," and upon Mershon's statement that "she feels very threatened and is very afraid about what this student may do." Diercks stated that David was a "child in need of protection or services," "one whose behavior, condition, or environment is such as to be injurious or dangerous to the child or others." Minn. Stat. § 260C.007, subd. 6(9).

Ordinarily, after a CHIPS petition has been filed, the parties appear before the court voluntarily, or the court issues a summons for a hearing concerning the allegations. Minn. Stat. § 260C.151, subd. 1. An exception exists, however, that allows immediate custody of a child prior to a hearing for "emergency protective care." The statute provides that,

> If the court makes individualized, explicit findings, based on the notarized petition or sworn affidavit, that there are reasonable grounds to believe the child is in surroundings or conditions which endanger the child's health, safety, or welfare that require that responsibility for the child's care and custody be immediately assumed by the responsible social services agency and that continuation of the child in the custody of the parent or guardian is contrary to the child's welfare, the court may order that the officer serving the summons take the child into immediate custody for placement of the child in foster care.

Minn. Stat. § 260C.151, subd. 6; *see* Minn. R. Juv. Prot. P. 28.02, subd. 1(b). Diercks prepared an ex parte petition for emergency protective care referring to this provision. The ex parte petition also relied on the contents of David's three essays as well as Mershon's concerns and concluded that immediately taking David into protective custody was warranted. Boese's personal notes indicated that he found no basis for criminal prosecution or civil commitment and that the essays may have been in Mershon's filing cabinet for "weeks/months," but his notes also indicated that he believed a CHIPS petition would be appropriate.

Diercks and Boese signed both sworn petitions. Diercks then submitted the petitions to Cook County District Court Judge Kenneth Sandvik. That day, January 25, Judge Sandvik executed an order ("ex parte order") authorizing David's immediate detention at Miller Dwan Adolescent Mental Health Unit and scheduled an emergency protective care hearing for January 28. That evening, Diercks and Zallar went to the Riehms' home, seized David, and placed him in protective custody.

Diercks and Zallar transported David to Duluth, Minnesota, approximately 150 miles from his home. Because Miller Dwan was full, David was placed in the adult psychiatric ward at nearby St. Luke's Hospital. The following night, January 26, an ambulance service transferred him to Miller Dwan. Dr. Peder Svingen, a psychiatrist, examined David on January 27 and concluded that he suffered from adjustment disorder but was not mentally ill or dangerous. David remained in detention at Miller Dwan that night. David was transported to court on January 28 for his hearing. At the hearing, Boese recommended unconditional dismissal of the CHIPS petition, which the court granted, and David was returned to Colleen's custody.

Colleen did not pay the medical bills from Miller Dwan, St. Luke's, or the ambulance service, totaling $5,863. DeBevec wrote Colleen and requested the Riehms' health insurance information. She explained that Cook County's policy required patients to submit health insurance information and that any bills unpaid by the insurance company would then be paid by the county. Miller Dwan sent a similar letter and warned that if she refused to provide her insurance information, her account would change to "self-pay status." The ambulance service also sent a letter and warned of future collection efforts. Miller Dwan's collection agency made a negative credit inquiry against Colleen. Colleen claims that her bank denied a consolidation loan to her on account of that negative credit inquiry, which cost her $11,221 in interest she would have saved over five years.

The Riehms brought suit under 42 U.S.C. § 1983 for constitutional violations and under Minnesota law. David alleged that his First Amendment right to free

speech was violated because he was detained based on the contents of his creative writing essay. He also argued that his detention violated his Fourth Amendment right to be free from unreasonable seizures because Diercks could not have relied upon the ex parte order in good faith, Diercks's ex parte petition contained material omissions, and the detention was executed unreasonably. Colleen asserted that her Fourteenth Amendment right to familial integrity was violated when David was taken, and she claimed that Cook County's failure to pay David's medical bills violated substantive due process under the Fourteenth Amendment. They also brought state law tort and constitutional claims. The district court granted the county defendants' motions for dismissal and summary judgment. The Riehms appeal.[4]

## II.    DISCUSSION

The county defendants successfully moved for judgment on the pleadings or for summary judgment. The district court did not explicitly state on which basis it made its decision. The Riehms argue that the district court dismissed the claim pursuant to Federal Rule of Civil Procedure 12(b)(6). However, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed R. Civ. P. 12(d); *see Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992). In this case, after the Riehms filed their amended complaint, they offered four affidavits from Colleen and affidavits from David, six of David's classmates, and a newspaper reporter, along with declarations from the Riehms' attorney. Several creative writing samples from David's classmates were submitted. The record also contains numerous other pieces of evidence, including Boese's notes composed prior to the application for the ex parte order, Dr. Svingen's examination

_____

[4]The Riehms do not appeal the dismissal of their claims under the Minnesota Human Rights Act, the Americans with Disabilities Act, the Minnesota Patient Bill of Rights, their abuse of power claim, or alleged violations of the Minnesota Constitution under Article I, §§ 3 (Liberty of the Press) or 16 (Freedom of Conscience).

notes, a transcript of the CHIPS hearing, Diercks's subsequent resignation from his social worker position, and newspaper articles discussing the incident. The county defendants and the Riehms relied on this evidence in their filings, and the district court considered and cited the evidence in its order. Because the Riehms presented evidence outside the pleadings that the district court considered, we will review the district court's decision as a grant of summary judgment.[5]

We review the district court's grant of summary judgment de novo. *Russell v. Hennepin County*, 420 F.3d 841, 847 (8th Cir. 2005). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We view the facts in the light most favorable to the non-moving party. *Id.*

---

[5]Federal Rule of Civil Procedure 12(d) requires that when the district court treats a motion to dismiss as a motion for summary judgment, the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." We have held that parties have constructive notice that the district court will treat the motion as one for summary judgment when the moving party states that it is moving for summary judgment and the parties submit and refer to material outside of the complaint. *See Madewell v. Downs*, 68 F.3d 1030, 1048 (8th Cir. 1995); *Angel v. Williams*, 12 F.3d 786, 788 & n.3 (8th Cir. 1993). The county defendants styled their motion as a motion to dismiss or, in the alternative, for summary judgment. The Riehms referred to and relied on numerous material outside of the complaint in their memorandum in opposition to the county defendants' motion. The Riehms also acknowledged the standard for summary judgment in their memorandum in opposition. Because the Riehms had notice that the county defendants sought summary judgment, introduced and relied on material outside the complaint, and acknowledged the standard for summary judgment when opposing the county defendants' motion, they had constructive notice sufficient under Rule 12(d). Furthermore, the county defendants moved to stay discovery, which the Riehms opposed and the district court granted. The Riehms, however, did not appeal the stay.

## A.    Federal Claims

In a § 1983 action, state actors may be entitled to qualified immunity. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). We first ask "whether the plaintiff's allegations establish a violation of the Constitution." *Sherbrooke v. City of Pelican Rapids*, 513 F.3d 809, 813 (8th Cir. 2008). If there is no violation, then we need not inquire further. *Hayek v. City of St. Paul*, 488 F.3d 1049, 1054 (8th Cir. 2007). If there is a constitutional violation, we ask whether it was clearly established at the time of the violation such that a reasonable person would have known that his actions violated a constitutional right. *Sherbrooke*, 513 F.3d at 813.

As a preliminary matter, we find that the Riehms have not presented sufficient evidence regarding any First or Fourth Amendment violations by Cook County or by Diercks's supervisor, Ann DeBevec. The county cannot be held vicariously liable for its agents' actions under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, the Riehms must identify a county policy or custom that caused their injuries, which they fail to do. *See id.*; *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007). Additionally, "[a] supervisor may be held individually liable under § 1983 if [s]he directly participates in the constitutional violation or if [s]he fails to train or supervise the subordinate who caused the violation." *Brockington*, 503 F.3d at 673. The Riehms present no evidence that DeBevec was directly involved in the alleged constitutional violations or that she failed to train or supervise Diercks.[6]

---

[6]Colleen also appeals the district court's conclusion that the county's failure to pay the medical bills from Miller Dwan, St. Luke's and the ambulance service before litigation did not violate her substantive due process right under the Fourteenth Amendment. She points out that Minnesota statute requires the county to pay medical bills for detentions of this type. *See* Minn. Stat. § 260C.188, subd. 1. She notes that the county has a policy that requires individuals to submit insurance information before it pays bills, which the statute does not require. Also, the county's

Therefore, the district court did not err in granting summary judgment to DeBevec and the county, and our analysis focuses on the actions of Diercks.

### 1. First Amendment Claim

David claims that he was seized and detained in retaliation for the exercise of his free speech rights under the First Amendment. The First Amendment does not protect a true threat, "a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc). Additionally, David's speech occurred in the special context of the school environment, where "schools may regulate some speech even though the government could not censor similar speech outside the school." *See Morse v. Frederick*, 551 U.S. ---, 127 S.Ct. 2618, 2627 (2007) (internal quotation omitted).

In *Pulaski*, a student received a letter from her ex-boyfriend expressing the desire to molest, rape and murder her. The author wrote that he intended to lie under the student's bed with a knife and kill her in her sleep. Even though the letter was composed months before the student received it and even though the student received the letter from a third party rather than directly from the author, we concluded that the letter was a true threat and would not receive First Amendment protection. *Pulaski*,

failure to pay the bills harmed her credit rating and affected her ability to obtain a loan. On appeal, she characterizes her claim as a substantive due process claim, which means she must show that "the officials acted in an arbitrary or capricious manner, or so as to shock the conscience." *Herts v. Smith*, 345 F.3d 581, 587 (8th Cir. 2003). DeBevec, acting pursuant to county policy, refused to pay David's medical bills until she received Colleen's insurance information. While the district court agreed that the Minnesota statute did not require Colleen to disclose her insurance information, we agree with the district court that placing this requirement on Colleen did not rise to the level of shocking the conscience.

306 F.3d at 626–27. We emphasized that "in the wake of Columbine and Jonesboro," we expect reasonable school officials to take "some action based on . . . violent and disturbing content." *Id.* at 626 n.4. The school board expelled the author, and we found that the expulsion did not violate the First Amendment. The letter "exhibited . . . pronounced, contemptuous and depraved hate" for the student and contained numerous obscenities. *Id.* at 625. We noted that the letter was "extremely intimate and personal," containing "violence . . . directed unequivocally" at the student, and that the author never attempted to alleviate the student's concerns. *Id.*; *see also Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007) (concluding that a student's creative writing diary that described a pseudo-Nazi group, injuries to students, and a Columbine-type shooting was not protected by the First Amendment).

While David lacked the history of violent tendencies we found relevant to the true threat analysis in *Pulaski*, the other factors considered in our analysis establish that David's third essay qualifies as a true threat. While the author of the threat in *Pulaski* did not give his letter to the subject of the threat, David provided his essays directly to Mershon, and he submitted them on the school's campus. His first essay, discussing a student's nocturnal emission, penetrating his anus on a toy, slipping on his own blood, and getting run over by a bus, contained troublesome descriptions. Although his second and third essays do not specifically name Mershon or David, the context of these essays leaves little doubt that David was referring to Mershon and himself. His second essay reflected hatred for Mershon, pejoratively naming her "Cuntchenson" and criticizing her as "old-fashioned, uncreative, paranoid, [and] jealous." His third essay went significantly farther and expressed, in graphic terms, a plan to kill her and himself. The details of the murder-suicide in the essay occur in the context of references to the movie *Bowling for Columbine*. David begins the essay with a dream about a gun and eating lunch "like a prisoner sentenced to death." After his "satanic" visit to his teacher's class, he feels a "sign from god" as he takes a gun from church. David mentions that other students had "no idea of what was about to happen." He describes the murder of his teacher in gruesome detail, including

-12-

shattering her eye with a bullet and licking her blood from his lips. He then describes the shooter's suicide. This lengthy essay describing an obsession with weapons and gore, a hatred for his English teacher with a similar name who had been critical of his prior essays, a surprise attack at a high school, and the details of his teacher's murder and the narrator's suicide lead to the inescapable conclusion that it was a serious threat directed at Mershon. Although the third essay was allegedly written months earlier, just like the letter in *Pulaski*, Mershon reacted immediately after she received it, and she quite reasonably felt personally threatened. We conclude that as in *Pulaski*, David's third essay constitutes a true threat and is not protected under the First Amendment.

### 2. Fourth Amendment Claim

The district court applied the *Rooker-Feldman* doctrine[7] to David's Fourth Amendment claim and held that "it is not the role of this Court to oversee the propriety of the state judge's decision to issue the order." *Riehm v. Engelking*, --- F. Supp. 2d ---, 2007 WL 37799, at *5 (D. Minn. 2007). If the *Rooker-Feldman* doctrine applies, federal courts lack subject matter jurisdiction. *Simes v. Huckabee*, 354 F.3d 823, 827 (8th Cir. 2004). We review the district court's determination of a lack of subject matter jurisdiction de novo. *Simes*, 354 F.3d at 827.

*Rooker-Feldman* "is a narrow doctrine." *Lance v. Dennis*, 546 U.S. 459, 464 (2006). It applies only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The *Rooker-Feldman* doctrine "may be inapplicable where federal plaintiffs have not been

---

[7]*D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).

-13-

given a reasonable opportunity to raise their federal claims in the state proceedings." *Simes*, 354 F.3d at 827; *see Skit Intern., Ltd. v. DAC Techs. of Ark., Inc.*, 487 F.3d 1154, 1157 (8th Cir. 2007). *Rooker-Feldman* does not apply where the federal plaintiff was not a party in state court. *Lance*, 546 U.S. at 466.

We conclude that the *Rooker-Feldman* doctrine does not apply to David's Fourth Amendment claim. First, the Riehms could not be considered parties to the ex parte petition. They had no opportunity to participate in the state court proceeding, either the CHIPS petition proceeding (prior to the February 28 hearing) or the ex parte petition proceeding in which the court issued the ex parte order. Second, the Riehms do not seek to overturn the ex parte order by this action. Rather, they seek redress under 42 U.S.C. § 1983 for an alleged unconstitutional seizure of David. It is possible for a § 1983 action to implicate *Rooker-Feldman*. *See, e.g.*, *Prince v. Ark. Bd. of Exam'rs in Psychology*, 380 F.3d 337 (8th Cir. 2004) (holding that after plaintiff litigated revocation of his psychology license in state court, he could not bring a federal suit under § 1983 alleging additional claims). Nevertheless, as the Ninth Circuit has explained:

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker-Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.

*Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003) (cited favorably in *Exxon*, 544 U.S. at 293). David's claim is actually an "independent claim," because it alleges unconstitutional actions by Diercks in seeking and executing the ex parte order. *See Exxon*, 544 U.S. at 293. The Riehms are not challenging the state court's issuance of the ex parte order. Therefore, the *Rooker-Feldman* doctrine does not apply.

Turning to the merits of David's Fourth Amendment claim, we explained in *Heartland Academy Community Church v. Waddle* that the Fourth Amendment

-14-

requires that the protective seizure of children occur pursuant to a court order, or, in the absence of a court order, pursuant to probable cause or exigent circumstances. 427 F.3d 525, 533 (8th Cir. 2005). In this case, Diercks acted pursuant to a court order. He prepared and filed the ex parte petition and the CHIPS petition with a detached and neutral judge who signed the ex parte order authorizing David's seizure.

David argues that Diercks could not rely in good faith on the ex parte order because the order was "so lacking in the indicia of probable cause as to render official belief in its existence unreasonable." *See Malley*, 475 U.S. at 345 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). He argues that the petitions were so lacking in an adequate basis to show that David's welfare was in danger and that custody with Colleen was contrary to his welfare that Diercks could not reasonably rely on Judge Sandvik's issuance of the ex parte order. *See* Minn. Stat. § 260C.151, subd. 6. If an officer relies on an ex parte order in good faith, then he is entitled to qualified immunity. *Malley*, 475 U.S. at 345. In assessing good faith reliance on an order, "we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007), *cert. denied*, 552 U.S. ---, 2008 WL 754361 (U.S. Mar. 24, 2008). "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

Diercks seized David pursuant to an ex parte order duly issued by Cook County District Court Judge Sandvik pursuant to Minnesota law, a law that authorizes the removal of children from parental custody in any case in which continued custody poses an immediate threat to the child's health or welfare. *See K.D. v. County of Crow Wing*, 434 F.3d 1051, 1056 (8th Cir. 2006) (finding that the Minnesota child protection statute is not "limited to instances of abuse or neglect investigations"). The ex parte petition extensively detailed that David's essays were disturbingly violent,

that the essays grew more personalized towards Mershon, that the third essay was a "veiled threat towards Ms. Mershon," that the essay included "many threats" toward his teacher, that the student in the essay shoots the teacher in a fit of rage as a directive from God, and that Mershon felt "very threatened" and "very afraid" because of the obvious parallels between David's essay and her own relationship with David. In addition to the contents of the ex parte petition, Diercks was aware of Mershon's report to law enforcement that she had spoken to Colleen about David's first and second essays and believed they were on the "right track" until she subsequently read the "Bowling for Cuntchenson" essay. Diercks had a reasonable basis to believe that David's apparent threat to murder Mershon and commit suicide placed David's welfare at risk and that allowing David to remain in his mother's custody, in light of Mershon's previous ineffective discussion with Colleen about the first two essays, was contrary to his welfare. The ex parte order was not so lacking in indicia of probable cause as to render Diercks's reliance on it unreasonable. Therefore, Diercks's good faith reliance on the ex parte order was reasonable.

David also claims that Diercks omitted material facts from the ex parte petition and that had this information been included, Judge Sandvik would not have issued the ex parte order.[8] "A warrant based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth' violates the Fourth Amendment." *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). The party challenging the ex parte petition must show that the

---

[8]Relying on *Groh v. Ramirez*, 540 U.S. 551 (2004), David also argues that the ex parte order was facially invalid, which should have been obvious to Diercks. According to *Groh*, a warrant is facially invalid if it does not particularly state the thing or, in this case, the person to be seized. *See id.* at 565. David's allegations about the deficiencies in the ex parte order do not claim a lack of specificity of the person to be seized, which is the basis of a "facial" challenge. Instead, his allegations concern omissions from the ex parte petition that he claims Diercks should have known vitiated probable cause. David's challenge is properly analyzed under a *Franks* analysis, not as a facial challenge.

-16-

petitioner omitted facts with the intent to mislead or with reckless disregard for the truth and that the ex parte petition, if supplemented by the omitted information, would not have been sufficient to support a finding of probable cause. *Id.* at 1099.

David argues that our *Heartland* decision is analogous to this case. In *Heartland*, Waddle, a social worker, effected the removal of more than one hundred students at Heartland Christian Academy, some by ex parte order and others without court order, based on allegations of mistreatment and abuse. *Heartland*, 427 F.3d at 528–29. Waddle submitted an ex parte petition that contained "stale information, misinformation, and material omissions" that rendered the seizures unreasonable. *Id.* at 533. In *Heartland*, Waddle identified eight different abuse-related allegations in the ex parte petition, four of which were subsequently proven to be false. *Heartland Acad. Cmty. Church v. Waddle*, 317 F. Supp. 2d 984, 1093 (E.D. Mo. 2004).

David, however, does not identify any falsehoods in Diercks's ex parte petition. Instead, David cites a series of omissions that he asserts rise to the level of a constitutional violation by Diercks. Relying on Boese's notes, he alleges that Diercks omitted that Boese found no basis for criminal prosecution, that Boese found no statutory basis for civil commitment, and that the essays might have been in the classroom file for "weeks/months." He also alleges that Diercks omitted that David had no mental illness or criminal history; that David's family was not the subject of any investigation and, therefore, Diercks could not aver that David's remaining in his mother's custody was contrary to his welfare; that Mershon was unsure about referring the case for criminal prosecution; and that Mershon had received disturbing creative writing essays from other students without reporting them to authorities.[9]

We reject David's argument. We find no evidence suggesting that Diercks intended to mislead the state court or that he acted with reckless disregard for the

[9]These essays discussed the rape of Jesus, a school bully killed by head trauma and a punctured jugular, and suicides.

truth. Although Boese and Mershon knew much of the omitted information, there is no evidence in the record that the Diercks was aware of this information. For instance, no evidence was submitted showing that Diercks knew about the disturbing creative writing assignments turned in by other students. David points to omissions reflected in Boese's notes, but he points to no evidence that Diercks knew about the contents of Boese's personal notes or that Boese ever expressed the contents of his notes to Diercks. Even if Diercks knew the contents of Boese's notes, the notes indicate that Boese supported the CHIPS petition, and David was detained under an ex parte order related to a CHIPS petition that Boese also signed. David was not detained by a criminal warrant or a civil commitment, which Boese apparently did not support. Additionally, we find no basis to construe the other alleged omissions, including the failure to report David's lack of mental illness or criminal history, as attributable to Diercks's intentional or reckless disregard for the truth.

Even if we were to conclude that Diercks omitted these details with reckless disregard for the truth, the omissions are not "so probative they would vitiate probable cause." *Heartland*, 317 F. Supp. 2d at 1092. Unlike the *Heartland* case, there is no evidence here that Judge Sandvik would not have issued the ex parte order had the omitted information been included. Although it is unclear when David submitted the third essay, even assuming it was submitted months before Mershon read it, we do not consider it stale. "The timeliness of the information supplied in an affidavit depends on the circumstances of the case . . . ." *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999). A school shooting may require extensive planning. *See, e.g.*, Julie Cart, *Teens Planned Assault for a Year, Diary Says*, L.A. Times, Apr. 25, 1999, at 1 (describing that a diary indicated the gunmen behind the Columbine massacre planned their attack for a full year). We conclude that even if the omitted details cited by David were included in the petitions, they would not affect the underlying probable cause determination that David posed a potentially serious threat to himself and to Mershon and that David's "surroundings or conditions" endangered his "health, safety, or welfare" requiring his immediate protective custody. Minn. Stat. § 260C.151, subd. 6.

In light of the gravity of the potential consequences of inaction in the face of evidence suggesting a potential attack, we expect social workers to take reasonable action. *See Pulaski*, 306 F.3d at 626 & n.4. The gruesome and vivid description of an attack on Mershon at Cook County High School provided a reasonable basis for the conclusion that David posed an immediate danger to himself, Mershon and perhaps others if he remained in his mother's custody without professional evaluation. We conclude Diercks's petitions and his reliance on the ex parte order did not violate the Fourth Amendment.[10]

In addition, David asserts that the detention was not effected properly because it was not accomplished by the least restrictive means and was unreasonable under the Fourth Amendment. He argues that he should not have been placed in the adult ward at St. Luke's for one night because it was not the least restrictive means of detention. Minn. Stat. § 260C.181. The Supreme Court has "repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means." *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002). Under the circumstances, it was reasonable to detain David one night at a nearby adult ward because the children's ward was full. He was promptly moved to Miller Dwan as soon as space was available.

David finally argues that after his psychiatric evaluation revealed that he had no mental illness and posed no threat, he should have been released immediately on January 27, not after the hearing January 28. David cites *O'Connor v. Donaldson*, which held that an involuntary psychiatric confinement becomes unconstitutional once the lawful basis for confinement no longer exists. 422 U.S. 563, 575 (1975). But

---

[10]David also argues that the petitions were invalid because they were not notarized. *See* Minn. Stat. § 260C.151, subd. 4. Diercks, however, signed the petitions that stated he had been "duly sworn," which complies with the statutory requirement that the court base its decision on a "notarized petition or sworn affidavit."

David was not confined under mental health law; he was confined pursuant to child protection law, and Judge Sandvik found that David needed to be confined until the court could conduct an evaluation at a hearing scheduled for January 28. Additionally, *O'Connor* did not involve a "challenge to the initial commitment," but a challenge to a prolonged commitment after the justification for the initial commitment had passed. *Id.* at 567. David offers no law in support of the proposition that his initial detention before his child protection hearing, during which a judge could evaluate the findings of the psychiatrist and any other evidence, violates the Fourth Amendment.[11]

## B. Minnesota Claims

The district court also granted the county defendants' motion for summary judgment with regard to the Riehms' state law claims.

David alleges that his confinement constituted false imprisonment. According to Minnesota common law, "[A]n individual may not, without legal justification, be confined against her or his will." *Gleason v. Metro. Council Transit Operations*, 563 N.W.2d 309, 319 (Minn. Ct. App. 1997). Because we find that Diercks had legal justification to detain David, we reject this claim.

---

[11]Colleen also asserts a claim against Diercks regarding her Fourteenth Amendment liberty interest in a familial relationship. "Our court has recognized the liberty interest which parents have in the care, custody, and management of their children." *Manzano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 509 (8th Cir. 1995). In *Manzano*, we granted a social worker qualified immunity because he investigated "upon a reasonable suspicion of child abuse." *Id.* at 511. This case does not concern child abuse, but, as discussed above, Diercks had a "reasonable suspicion" of a threat to David's welfare that justified the ex parte order removing David from his home. Because there was no Fourth Amendment violation surrounding David's detention, we reject Colleen's claim.

The Riehms' state constitutional claims focus upon Article I, §§ 2 (Equal Protection), 7 (Due Process), 8 (Remedies), and 10 (Searches and Seizures).  The Riehms appeal the district court's dismissal of their constitutional claims seeking damages.  Minnesota courts explicitly refuse to find causes of action for damages under the Minnesota Constitution on their own unless the Minnesota Supreme Court has recognized the cause of action.  *See Mitchell v. Steffen*, 487 N.W.2d 896, 905 (Minn. Ct. App. 1992) (finding that even if cause of action for damages existed under the Minnesota Constitution, sovereign immunity barred torts for deprivation of constitutional rights), *aff'd on other grounds*, 504 N.W.2d 198 (Minn. 1993); *Bird v. State, Dep't of Pub. Safety*, 375 N.W.2d 36, 40 (Minn. Ct. App. 1985) (recognizing that Minnesota Supreme Court has not recognized any tort for the violation of due process rights).  We agree with the district court that because the Minnesota Supreme Court has not established an action for damages for these constitutional violations, the Riehms' claims fail.

## III.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____