# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-2459

———————————————

Judy Lynn Smith-Dandridge, as Administratrix of the Estate of Andrew Dawson
Bell, Deceased

*Plaintiff - Appellant*

v.

Officer Jarrett Geanolous; M. Kurtis Sutley, Name changed per amended
complaint, also known as M. Curtis Sutley; Brandon Jones; Tim Helder; Leigh
Brewer; M. Arnold, Booking Sergeant; Jeremy Riley; Joseph Standrod; Ado
Sanchez, Intake Officer; A Weir, Intake Officer; Calvin Mitchell; J. Sorrell, A Pod
Corporal; Dustin Carter; Chad Morgan; Joseph Jennings; Mitchell Smothers;
Charles Dominguez; Christy Hill; John Doe, *Defendant*s 1-6; Randall Denzer

*Defendants - Appellees*

————————

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

————————

Submitted: September 20, 2023
Filed: March 29, 2024

————————

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

————————

KELLY, Circuit Judge.

Andrew Dawson Bell died by suicide while detained at the Washington County Detention Center (WCDC) in Fayetteville, Arkansas. Bell's mother, Judy Lynn Smith-Dandridge, sued various Fayetteville Police Department officers, WCDC employees, nurses, and Washington County itself, pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act, Arkansas Code Ann. § 16-123-105. After the district court[1] granted summary judgment in favor of all defendants, Smith-Dandridge appealed. We affirm.

I.

Bell had a long history of mental illness and substance abuse. On the afternoon of September 24, 2016, Bell called Smith-Dandridge to tell her that someone was trying to break into his apartment. At Smith-Dandridge's suggestion, Bell called the police to report a burglary. Officer M. Kurtis Sutley was dispatched to the apartment complex. Upon arriving, he walked around Bell's building and spoke to several individuals in the parking lot but did not encounter Bell. When no one reported seeing anything out of the ordinary, and Officer Sutley found nothing unusual, he left.

That evening, Bell called the police again, reporting that people were on his balcony and that he had armed himself with knives. Officer Sutley and Officer Brandon Jones were dispatched to Bell's apartment. When they arrived, they found Bell "sweating profusely." They later recounted that he "appeared excited and stated that people had been crawling on his balcony breaking things and that someone had climbed a tree next to his bedroom window and was trying to break in." The officers observed that the tree in question was incapable of supporting a person's weight, and they found no evidence of vandalism or burglary. So, when Bell said he planned to go to sleep, they left.

---

[1]The Honorable P.K. Holmes, III, United States District Judge for the Western District of Arkansas.

Later that night, one of Bell's neighbors called the police, and Officers Sutley and Jones were again dispatched to Bell's apartment building. They were advised that an intoxicated person had threatened someone and was stabbing the ground with knives. Officer Jones was first to arrive and saw Bell walking "briskly" towards his apartment with a flashlight in one hand and two knives in the other. He pointed his weapon at Bell and ordered him to put his hands in the air, drop the knives, and get on the ground. Bell complied. When Officer Sutley arrived, Bell was lying on the ground in a prone position. Officer Sutley then handcuffed Bell and escorted him into a police vehicle. Bell was arrested for terroristic threats; disorderly, drunken, or insane conduct; and carrying a weapon.

Before they left for the WCDC, Officer Sutley asked Bell several general identification questions, which Bell answered. Bell asked Sutley about the charges he was facing, bail, and whether he could make phone calls from the jail. During the trip to WCDC, Bell said that he needed to go to the hospital because his hand was broken. Officer Sutley later testified that because Bell had not indicated that he was in pain, he thought a jail nurse would be able to diagnose any injury, so they proceeded directly to WCDC.

They arrived at WCDC at about 11:15 p.m. During his intake and booking process, Bell interacted with Intake Officer Jeremy Riley, Booking Officer Leigh Brewer, and Booking Sergeant Mike Arnold (the intake defendants). Officer Riley completed Bell's intake form, Officer Brewer booked him into jail and completed his medical questionnaire, and Sergeant Arnold reviewed Bell's intake and booking forms. Bell reported that he had been diagnosed with bipolar disorder, anxiety, depression, and suicidal ideations. And he indicated that he was taking medications including Clonazepam, Remeron, Seroquel, Adderall, and Lithium. Bell also disclosed that he had attempted suicide four times, most recently about one and a half years prior, but that he was not currently thinking about harming or killing himself or anyone else.

At least two nurses were on duty at WCDC while Bell was detained—Charles Dominguez and Christy Hill (the nurse defendants). Following Bell's intake, Nurse Dominguez examined his hand, and shortly after 4:00 a.m., reported that it was not swollen or bruised and that Bell did not appear distressed. Dominguez also reviewed Bell's intake questionnaires, which listed his medications and diagnoses. Then, at 6:00 a.m. on September 25, Nurse Dominguez's shift ended, and Nurse Hill's shift began.

At that point, Bell was housed with WCDC's general population. Deputies Joseph Jennings, Mitchell Smothers, Dustin Carter, and Chad Morgan (the jailers) were working in that area, conducting jail checks, responding to the intercom, and monitoring Bell's cell block and others through windows and surveillance video. Beginning shortly after 9:00 a.m., Bell made several phone calls from his cell block to Smith-Dandridge and bail bond agents. These calls primarily addressed his arrest and potential bail.

At 3:17 p.m., within a minute of his final call ending, Bell pushed the intercom button to report that he was having a panic attack. Deputy Jennings responded and told Bell he would inform a nurse. The surveillance video showed Bell pacing through his cell block, sitting and rocking on the floor, banging on the door, and hunching over a trash can for several minutes. Deputy Jennings called for a nurse, but when he learned that Nurse Hill was occupied elsewhere, he checked on Bell himself. When he entered the cell block, about ten minutes after Bell had first hit the intercom, Bell was sitting on the floor. They spoke for a few minutes, and then Deputy Jennings updated Nurse Hill about Bell's status. He told her Bell "did not seem to be panicking at first," then "seemed to panic" as they spoke, but that when he left, Bell "did not seem to be panicking anymore." Nurse Hill told Deputy Jennings that they would "wait for now" to visit Bell.

After Deputy Jennings left the cell block, surveillance video showed that Bell stayed relatively still and seated for most of the next twenty-five minutes. Then, Bell used the intercom again to request that a nurse check on him. Deputy Carter

responded and told Bell that the nurse would come "when she got a chance." Within seconds of that call, Bell returned to his cell, where he almost immediately hanged himself. Between ten and fifteen minutes later, two jailers found him during their routine jail checks. They were unable to revive him.

Smith-Dandridge alleged that Fayetteville police officers and WCDC intake, jailer, and nurse defendants were deliberately indifferent to Bell's serious medical need,[2] and that Washington County was deliberately indifferent in its failure to train jail staff.[3] After discovery, defendants moved for summary judgment. The district court granted summary judgment on the basis of qualified immunity, dismissed Smith-Dandridge's federal claims with prejudice, and dismissed any remaining state claims without prejudice. Smith-Dandridge appeals.

## II.

"Viewing the facts in the light most favorable to the non-moving party, we review the district court's grants of summary judgment de novo." Gilmore v. City of Minneapolis, 837 F.3d 827, 832 (8th Cir. 2016) (citing Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012); Fed. R. Civ. P. 56(a)). "When the defense of qualified immunity has been asserted, we evaluate both whether the defendant violated the plaintiff's constitutional rights and whether those rights were clearly established [at the time]." Scheffler v. Molin, 743 F.3d 619, 620–21 (8th Cir. 2014) (citing Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011)). "If there is no constitutional violation, however, we need not proceed further." Id. (citing Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir. 2008)).

---

[2]Smith-Dandridge conceded her case against Jarrett Geanolous, Joseph Standrod, Maria Sanchez, Steven Weir, Calvin Mitchell, and Jesse Sorrell.

[3]We treat Smith-Dandridge's official capacity claims against Tim Helder, Washington County Sheriff, and Randall Denzer, Washington County Jail Administrator, as a claim against Washington County itself. See Brockinton v. City of Sherwood, 503 F.3d 667, 674 (8th Cir. 2007).

III.

On appeal, Smith-Dandridge challenges the district court's grant of summary judgment in favor of the individual defendants and Washington County. First, she argues that genuine disputes of material fact preclude summary judgment on her deliberate indifference claims against Fayetteville police officers and the WCDC intake, jailer, and nurse defendants who were on duty during Bell's detention.[4] Second, she argues that the district court erred in granting summary judgment without adequately considering her failure-to-train claim against Washington County. We consider each challenge in turn.

A.

"'[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs,' including the risk of suicide." A.H. v. St. Louis Cnty., 891 F.3d 721, 726 (8th Cir. 2018) (quoting Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000)). "A pretrial detainee's deliberate indifference claim is governed by the Fourteenth Amendment[,] which extends to detainees at least the same protections that convicted prisoners receive under the Eighth Amendment." Perry v. Adams, 993 F.3d 584, 587 (8th Cir. 2021) (citing Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007)). An individual's status as a pretrial detainee or arrestee does not affect our analysis of deliberate indifference. See Barton v. Taber, 908 F.3d 1119, 1123–24 (8th Cir. 2018) (applying Eighth Amendment deliberate indifference standard to arrestee).

---

[4]Smith-Dandridge also argues that the district court improperly granted summary judgment on claims concerning WCDC defendants' failure to administer medication and a detoxification protocol. Although she did not articulate a separate claim based on these allegations, we nevertheless construe them to be part of her deliberate indifference claim. See Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995) ("Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." (citing Estelle v. Gamble, 429 U.S. 97, 104–05 (1976))).

Deliberate indifference has two components: an objective component, which "requires a plaintiff to demonstrate an objectively serious medical need," and a subjective component, which "requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." Vaughn v. Gray, 557 F.3d 904, 908 (2009) (citations omitted); see also Dadd v. Anoka Cnty., 827 F.3d 749, 755 (8th Cir. 2016) ("A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" (quoting Vaughn v. Greene Cnty., 438 F.3d 845, 851 (8th Cir. 2006))); Schaub v. VonWald, 638 F.3d 905, 914–15 (8th Cir. 2011) ("Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." (quoting Farmer v. Brennan, 511 U.S. 825, 839–40 (1994))). Assuming that Bell suffered from an objectively serious medical need, only the subjective component—whether defendants knew of and disregarded it—is at issue.

Determining whether a defendant knew that a detainee had a substantial risk of suicide demands a "fact specific analysis." Gregoire, 236 F.3d at 417. "A party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk was obvious." Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015). To establish that defendants had knowledge of the risk, "it is not enough merely to find that a reasonable person would have known about the risk, or that the officer should have known." Thompson v. King, 730 F.3d 742, 747 (8th Cir. 2013) (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)) (cleaned up). Rather, if defendants were "exposed to information concerning the risk and thus 'must have known' about it," a finding of deliberate indifference may be warranted. Letterman, 789 F.3d at 862 (quoting Farmer, 511 U.S. at 842). "[A]n official's failure to alleviate a significant risk that [they] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838.

1.

First, Smith-Dandridge argues that genuine disputes of material fact remain regarding whether Officers Sutley and Jones knew that Bell had a serious medical need and that they deliberately disregarded it when they transported him to WCDC, rather than to a hospital.

Smith-Dandridge asserts that the officers' review of Bell's arrest history and their interactions with him that day establish they had the requisite knowledge to establish deliberate indifference. When they first encountered Bell, he was hallucinating. However, the officers left Bell's apartment when he said he was going to sleep, and Smith-Dandridge does not argue that their observations at that point demanded otherwise. But she argues that there was evidence that the officers knew, at least by the time of their second interaction with Bell, that he was at substantial risk of suicide because, for example, the officers characterized Bell as "crazy," saw him hallucinating earlier, and observed his "bizarre" behavior, which included stabbing the ground and showing signs of "intoxication or mania."

Smith-Dandridge also asserts that Bell's arrest records, which referred to Bell as a "mental person," indicated that he had serious mental health needs. But Smith-Dandridge does not point to anything in these records that would have informed officers that Bell was having suicidal thoughts at the time of his arrest.[5] Although she also argues that Bell's behavior in the squad car showed signs of paranoia and hallucination, she does not dispute that Bell was cooperative and conversational or that his symptoms were consistent with intoxication. See Grayson v. Ross, 454 F.3d 802, 809 (8th Cir. 2006) (finding officers lacked knowledge of a serious medical need when "once arrested, [arrestee] sat calmly in the back of the patrol car, followed directions, answered questions posed, and remained quiet and seated on a bench

---

[5]Smith-Dandridge cites Bell's request to be taken to the hospital for a broken hand, but that injury is not the serious medical need she identifies for purposes of the officers' deliberate indifference. See Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) (per curiam) (recognizing a broken hand as a serious medical need).

inside the jail"); cf. Barton, 908 F.3d at 1124 (finding officers knew inmate had a serious medical need when he "had been in a car accident[; h]e could not follow simple instructions or answer basic questions; he was unable to stand without assistance and fell during the booking procedure").

Construing the record in Smith-Dandridge's favor, Bell's behavior put the officers on notice of signs of mental illness. That behavior did not, however, make it obvious to them that Bell had a substantial risk of suicide. Even Smith-Dandridge's medical expert acknowledged that Bell's behavior at the time of his arrest "could have been from substance intoxication, a medical condition such as hypoglycemia, and underlying mental health conditions such as a Schizophrenic break with reality or from numerous other medical causes." On this record, we cannot say that a reasonable jury could conclude that Officers Sutley and Jones knew Bell was at a substantial risk of suicide and deliberately disregarded it.

2.

Second, Smith-Dandridge argues that genuine disputes of material fact remain regarding whether WCDC defendants—the intake officers, jailers, and nurses— knew Bell was at a substantial risk of suicide and deliberately disregarded it.

Smith-Dandridge maintains that the intake and nurse defendants had actual knowledge of Bell's substantial suicide risk because they had "exposure to his most recent inmate medical form," which detailed Bell's prescription medications, diagnoses, and history of suicide attempts. However, the record does not show how this information would be sufficient on its own to make them aware of Bell's substantial risk of suicide at the time of intake. Cf. Dadd, 827 F.3d at 755 (finding that jail deputies and nurse knew of inmate's medical need when he "explained his condition, severe pain, and need for medication" to each of them). When Bell was asked directly if he was "currently having any thoughts about killing or harming [him]self," he said no. It was reasonable for defendants to take Bell's response into account. An inmate's response to that question is not dispositive of the subjective

inquiry but Smith-Dandridge does not dispute Bell's answer or argue that it was not relevant to the defendants' assessment of his current risk. See Coleman v. Parkman, 349 F.3d 534, 540 (8th Cir. 2003) ("[O]fficials do not violate the Constitution when they negligently fail to diagnose a prisoner's suicide risk."); cf. Ivey v. Audrain Cnty., 868 F.3d 845, 850 (8th Cir. 2020) (noting that "it's not beyond debate that . . . officers violated the constitution when they took [an inmate] at his word" about medical concerns).

Smith-Dandridge also argues that the jailer defendants knew of Bell's substantial risk of suicide because they had "access to" his records from when he was previously detained at WCDC. If they had reviewed those records, they would have known that Bell had been detained at WCDC in May 2016, when it appears he was checked by jail staff every fifteen minutes for about eight hours, and again in August 2016. This information—like that on Bell's medical form—is relevant. But beyond conclusory allegations, Smith-Dandridge does not explain how these records from Bell's previous stays at WCDC made jailers aware of his substantial risk of suicide on September 25, 2016. See Schaub, 638 F.3d at 915 ("Deliberate indifference must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" (quoting Lenz v. Wade, 490 F.3d 991, 993 n.1 (8th Cir. 2007))).

Smith-Dandridge further asserts that Bell's report of a panic attack made his suicide risk known to the jailers. But intake officers had not classified Bell as suicidal or as someone needing heightened observation. Instead, he was detained with the general jail population, and the jailers lacked a clear signal that Bell should have been observed or treated differently from other inmates. Cf. Gregoire, 236 F.3d at 419 ("[W]e must evaluate [a jailer's] actions in light of the information [they] possessed at the time, the practical limitations of [their] position and alternative courses of action that would have been apparent to an official in that position."). Moreover, when Bell reported that he was having a panic attack, Deputy Jennings alerted the nurse, and then personally visited Bell's cell block to check on him. After Deputy Jennings told Nurse Hill that Bell "seemed to panic" but then calmed down,

Nurse Hill decided to wait before visiting Bell. At that point, Bell showed signs of instability, but the record does not show that his jailers and nurses understood his words or actions as conveying an intent to harm himself.

"[W]e expect that jailers will learn from their failures in preventing suicide," see id., and we are confident the WCDC defendants will do so here. However, "they are not constitutionally liable for every failure, only those where they are deliberately indifferent to the risk of suicide." See id. On this record, the jailer defendants' inaction to prevent Bell's suicide does not constitute criminal recklessness. The failure to place Bell on suicide watch, or take other suicide-prevention measures, may have been negligent. There were indications that Bell's mental health was unstable, and he showed signs of agitation and anxiety. But there is not enough on the record before us to show the jailer defendants violated Bell's constitutional rights.

## B.

Finally, Smith-Dandridge argues that the district court erred in adjudicating her failure-to-train claim[6] against Washington County. "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from . . . a deliberately indifferent failure to train or supervise." Corwin v. City of Indep., 829 F.3d 695, 699 (8th Cir. 2016) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989)). More specifically, a county may be subject to § 1983 liability for failure to train when its "deliberate indifference to the need to train and supervise its employees cause[d] an employee to violate a third party's constitutional rights." A.H., 891 F.3d at 728 (citing Canton, 489 U.S. at 386–90).

Smith-Dandridge offered testimonial evidence and training records showing that WCDC defendants who interacted with Bell had not received any training about

---

[6]In the operative complaint, Smith-Dandridge did not allege a constitutional violation resulting from an official Washington County policy or unofficial custom.

suicide risk or prevention until after Bell's suicide. And a jail inspection report from October 2016 indicates that "[r]equired training hours for officers and related operations are struggling and at risk due to the strain on the current staff level." Smith-Dandridge also offered testimony indicating medical staff were only alerted about a suicide risk when a detainee explicitly said that they were currently thinking about suicide. This evidence suggests that Washington County lacked meaningful training to help staff identify and appropriately respond to detainees who presented with histories of mental illness and symptoms that placed them at risk of suicide.

Ultimately, however, Smith-Dandridge must show that the deficient training caused WCDC defendants to be deliberately indifferent to Bell's substantial risk of suicide. See Canton, 489 U.S. at 391. The basis for the municipality's liability—here, failure to train—must be the "moving force" that led to the alleged deprivation of a constitutional right. Speer v. City of Wynne, 276 F.3d 980, 985–86 (8th Cir. 2002) (citations omitted). In this case, Smith-Dandridge's theory of municipal liability is "entirely dependent on the [County's] responsibility for the [individual defendants'] alleged unconstitutional acts." Id. at 986. As a result, Smith-Dandridge's failure-to-train claim falls with the individual claims. See Webb v. City of Maplewood, 899 F.3d 483, 487 (8th Cir. 2018); Ridgell v. City of Pine Bluff, 935 F.3d 633, 636–37 (8th Cir. 2019).

IV.

We affirm the judgment of the district court.[7]

_____

---

[7]Because we affirm on the bases discussed above, we need not address Washington County's alternative ground to affirm.

-12-