[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 31, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14706

_____

D. C. Docket No. 05-03219-CV-MHS-1

DAVID BOIM,
KIMBERLY BOIM,

Plaintiffs-Appellants,

versus

FULTON COUNTY SCHOOL DISTRICT,
doing business as Fulton County Public Schools,
JAMES WILSON,
Superintendent of Fulton County
Board of Education,
EDWARD J. SPURKA,
As Principal of Roswell High School, all in their
individual and official capacities,

Defendants-Appellees.

_____

No. 06-14732

_____

D.C. Docket No. 05-02836-CV-MHS-1

RACHEL BOIM,
by and through her Conservator, Nancy Boim,
NANCY BOIM,
as Conservator of Rachel Boim, a Minor,

                                        Plaintiffs-Appellants,

                        versus

FULTON COUNTY SCHOOL DISTRICT,
doing business as Fulton County Public Schools,
JAMES WILSON,
Superintendent of Fulton County Board of Education,
EDWARD J. SPURKA,
As Principal of Roswell High School, all in
their individual and official capacities,

                                        Defendants-Appellees.

                        ————

                Appeals from the United States District Court
                    for the Northern District of Georgia

                        ————

                        **(July 31, 2007)**


Before DUBINA and BLACK, Circuit Judges, and LIMBAUGH,* District Judge.

————

\*Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

DUBINA, Circuit Judge:

This is a school speech case.[1]  On cross-motions for summary judgment, the district court granted the defendants' motions and denied the plaintiffs' motions. The plaintiffs then perfected their appeals.

## I.  BACKGROUND

In October 2003, Rachel Boim ("Rachel") was a student at Roswell High School ("RHS") in the Fulton County School District.  During her fifth period art class, Rachel gave a notebook of hers to a male student seated next to her.  The art class teacher, Travis Carr ("Carr"), observed the student writing in the notebook, which Carr did not then know belonged to Rachel.  Carr instructed the student to put the notebook away and resume his class work.  About five minutes later, Carr noticed the notebook in the student's lap again.  Carr asked the student for the notebook, but instead the student passed the notebook back to Rachel.  Carr asked

---

[1] Actually, there are two cases that are related.  The first case was filed by Nancy Boim on behalf of Rachel Boim in the Superior Court of Fulton County, Georgia, against the Fulton County School District ("District"), District Superintendent James Wilson, and Roswell High School Principal Edward J. Spurka.  The district court noted that the record is silent as to the relationship between Nancy Boim and Rachel, but the complaint alleges that Nancy Boim is Rachel's duly appointed conservator.  The second case was a virtually identical lawsuit filed by Rachel's parents, David and Kimberly Boim, in the State Court of Fulton County.  These cases have been consolidated for appeal purposes.

Rachel for the notebook, and she responded, "no," and stated that Carr first would have to say please. Rachel then placed the notebook in her book bag, removed a different notebook, and handed it to Carr. Carr noticed the switch. He persisted, and eventually Rachel gave him the notebook.

Later, after class, Carr looked through the multi-subject notebook and read the following entry, which was located behind a divider labeled "Dream":[2]

> As I walk to school from my sisters [sic] car my stomach ties itself in nots [sic]. I have nervousness tingeling [sic] up and down my spine and my heart races. No one knows what is going to happen. I have the gun hidden in my pocket. I cross the lawn and hed [sic] to my locker on A hall. Smiling sweetly to my friends hoping they dont [sic] notice the cold sweat that has developed on my forhead [sic]. Im [sic] walking up to the front office when the bell rings for class to start. So afraid that I think I might pass out. I ask if my mother dropped off a book I need. No. My first to [sic] classes pass by my heart thumping so hard Im [sic] afraid every one can hear it. Constantly I can feel the gun in my pocket. 3rd peroid [sic], 4th, 5th then 6th peroid [sic] my time is comming [sic]. I enter the class room my face pale. My stomach has tied itself in so many knots its [sic] doubtful I will ever be able to untie them. Then he starts taking role [sic]. Yes, my math teacher. I lothe [sic] him with every bone in my body. Why? I dont [sic] know. This is it. I stand up and pull the gun from my pocket. BANG the force blows him back and every one in the class sits there in shock. BANG he falls to the floor and some one [sic] lets out an ear piercing scream. Shaking I put the gun in my pocket and run from the room. By now the school police officer is running after me. Easy I can out run him. Out the doors, almost to the car. I can get away. BANG this time a shot was fired at me. I

---

[2]The narrative appears as it was transcribed in the district court's opinion, which noted only the most egregious of the many spelling and grammatical errors.

turn just in time to see the bullet rushing at me, almost like its [sic] in slow motion. Then, the bell rings. I pick my head off my desk, shake my head and gather up my books off to my next class.

*Boim v. Fulton County Sch. Dist.*, No. 1:05-CV-2836-MHS, slip op. at 2-3 (N.D. Ga. Aug. 1, 2006).

Shortly after school ended that day, Carr spoke with John Coen ("Coen") about Rachel's narrative. Coen, a school administrative assistant in charge of disciplinary matters, requested that Carr bring him the notebook the following morning. The next day, Coen reviewed the narrative and became concerned that it was "planning in disguise as a dream." (Tr. of Admin. Disciplinary Hr'g at 31 ("Tr.").) He consulted with the school's resource officer, *i.e.*, the school's police officer. The officer, James Young ("Young"), also was concerned about the narrative's school setting and violent nature. According to his testimony at the administrative hearing, he became especially concerned after discovering that Rachel's sixth period class was math and her teacher was a man.

Early in the day following Carr's discovery of the writing, after Coen and Young had discussed their concerns with each other, Young removed Rachel from her second period class and escorted her to RHS's administrative offices. School officials contacted Rachel's parents, and Coen and Young met with Rachel and her parents to discuss the incident. Rachel admitted that the notebook and the

5

relevant writing were hers but dismissed the narrative as merely a piece of creative fiction. Her parents supported her and dismissed any notion that Rachel's narrative evidenced an intent to harm anyone. RHS principal Edward J. Spurka ("Spurka") also participated in the meeting, though the extent of Spurka's participation is not clear from the record. At the end of the meeting, the administrators sent Rachel home.

Concerned primarily about the threatening undertones of Rachel's narrative in light of the massacre that occurred at Columbine High School in Colorado, the much more local shooting that occurred at Heritage High School in Conyers, Georgia, and terrorism following the attacks that occurred on September 11, 2001, Spurka decided that further investigation was necessary to determine whether Rachel had violated any school rules. Ultimately, Spurka, in collaboration with a team of school administrators and after consulting with Rachel's sixth period math teacher, who testified that he was "shocked" by the writing, felt "threatened," and was uncomfortable with the idea of having Rachel in his class (Tr. at 22-23), determined that Rachel had violated three school rules: Rule JD 4(iii) (threat of bodily harm); Rule JD 10 (disregard of school rules, directions, or commands); and Rule JD 17(disrespectful conduct). Of greatest relevance to this appeal is Rule JD 4(iii), which the parties stipulate states as follows:

A student shall not attempt to cause physical injury, threaten bodily harm, or behave in such a way as could reasonably cause physical injury to a school employee: (a) on the school grounds at any time; (b) off the school grounds at a school sponsored activity, function or event; or (c) en route to and from school or school sponsored activity.

Spurka suspended Rachel for 10 days beginning October 8th. He also recommended that she be expelled from RHS but deferred that decision to an independent arbiter, who later conducted a disciplinary hearing. After receiving evidence and hearing testimony, the hearing officer agreed with Spurka's recommendation and expelled Rachel. The district superintendent stayed Rachel's expulsion pending appeal to the Fulton County Board of Education ("BOE"), which affirmed the hearing officer's decision and Rachel's suspension but overturned the expulsion. Thus, Rachel was not expelled from RHS, and she did not appeal the BOE's decision.

Approximately two years later, Nancy Boim, on Rachel's behalf, and Rachel's parents filed the underlying lawsuits, which the defendants later removed from State court to federal district court. The district court granted the defendants' motions for summary judgment and denied the Boims' motions for partial summary judgment after determining that the defendants' actions did not violate Rachel's rights under the First Amendment of the United States Constitution.

## II.  ISSUES

(1)    Whether the district court erred in granting summary judgment in favor of the defendants on the basis that Rachel's suspension did not violate her First Amendment rights.

(2)    Whether the district court erred in concluding that Rachel was not entitled to any injunctive relief requiring the defendants to expunge her records of negative documentation relating to her suspension.

## III.  STANDARD OF REVIEW

We review a grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the nonmoving party.  *See*, *e.g.*, *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 450 F.3d 1257, 1269 (11th Cir. 2006).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006).

We review a district court's denial of injunctive relief for an abuse of discretion, though we review *de novo* the district court's relevant legal conclusions.  *Kidder, Peabody & Co., Inc. v. Brandt*, 131 F.3d 1001, 1003 (11th Cir. 1997).

## IV.  DISCUSSION

In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S. Ct. 733 (1969), the United States Supreme Court made clear that students do not "shed their constitutional rights to freedom of speech or expression

at the schoolhouse gate." *Id*. at 506, 89 S. Ct. at 736. The Court later held, nevertheless, that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S. Ct. 3159, 3164 (1986) (summarizing the holding in *New Jersey v. T.L.O.*, 469 U.S. 325, 340-42, 105 S. Ct. 733, 742-43 (1985)), and the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988) (quoting *Tinker*, 393 U.S. at 506, 89 S. Ct. at 736).

In our own circuit, we have held that school officials "must have the flexibility to control the tenor and contours of student speech within school walls or on school property, even if such speech does not result in a reasonable fear of immediate disruption." *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1248 (11th Cir. 2003). Nevertheless, student speech must at least "be likely to cause[] a 'material[] and substantial[]' disruption, . . . and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1272 (11th Cir. 2004) (citation omitted)

(quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).[3] "Under the *Burnside* standard, student expression may unquestionably be regulated when doing so 'contributes to the maintenance of order and decorum within the educational system.'" *Id.* at 1271 (quoting *Burnside*, 363 F.2d at 748).

There is no question that Rachel's writing constitutes expression.[4] After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we conclude that Rachel's actions, in writing the passage in her notebook, wherein she describes taking a gun into her sixth period classroom and shooting her teacher in front of other students, and then giving that notebook to another student, clearly caused and was reasonably likely to further cause a material and substantial disruption to the "maintenance of order and decorum" within RHS.

In *Scott*, we affirmed the district court's grant of summary judgment in favor of the school district where the school administration suspended two students for their display of the Confederate Flag on school premises. 324 F.3d at 1249-50. In

---

[3]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[4]The plaintiffs, in particular, appear to lose sight of the fact that Rachel's writing was not the sole basis for her punishment. She was also punished for her clearly insubordinate behavior, and it may well have been within the school's discretion to suspend or expel Rachel for her disrespectful conduct alone.

our decision, we noted that "[a]lthough public school students' First Amendment rights are not forfeited at the school door, those rights should not interfere with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve." *Id.* at 1247. We further stated that "[s]hort of a constitutional violation based on a school administrator's unsubstantiated infringement on a student's speech or other expressions, this Court will not interfere with the administration of a school." *Id.* This principle was recently reaffirmed by the Supreme Court in *Morse v. Frederick*, wherein the Court upheld an Alaska public school's policy of "restrict[ing] speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." 551 U.S. ___, slip op. at 8 (June 25, 2007).

According to a popular encyclopedic website, in the eight years preceding the incident underlying the instant appeal, there had been 10 well-known, student-perpetrated shootings in schools, not including college campuses, located within the United States. Wikipedia, *School Shooting*, http://www.wikipedia.org (on the main page search term "school shooting") (last visited July 11, 2007); *see also* CNN.com, *Are U.S. Schools Safe?*, http://www.cnn.com/SPECIALS/1998/schools/ (follow "School shootings map" hyperlink) (last visited July 11, 2007) (mapping

11

and summarizing the details of 16 student-perpetrated, school shootings in the same eight-year period).[5]  Notably, at the time of the incident involving Rachel, it had been less than five years since a 15-year-old high-school student shot six fellow students at Heritage High School, which is less than an hour's drive from RHS.  Mike Morris, *6 Injured in Shootings at Rockdale High School; Suspect in Custody; Officials Say Wounds Not Life-Threatening*, Atlanta J. & Const., May 20, 1999, at A1.  It had been less than two months since a high-school freshman had been arrested for possessing a concealed, loaded 9 mm handgun at a school located approximately 20 miles away from Rachel's school.  Doug Payne, *Cherokee Student with Gun Arrested*, Atlanta J. & Const., Aug. 13, 2003, at B3.

Furthermore, although school safety undoubtedly has always been a chief concern of teachers and administrators, following the enactment of the No Child Left Behind Act of 2001 ("the Act"), Pub. L. No. 107-110, Title IX, § 901, 115 Stat. 1425, 1984 (2002), it became even more important.  Section 901 of the Act requires states receiving federal education funds to allow students who attend a

_____

[5]This, of course, does not take into account numerous other school shootings that have occurred internationally, including on college campuses, both during the relevant time period and since then, most notably the Virginia Tech massacre, in which 32 people were murdered.  Shawn Day et al., *Massacre at Tech Deadliest Rampage Ever in U.S.*, Daily Press, Apr. 17, 2007, at A1.

persistently dangerous school or who become victims of a violent crime while on school property to attend another school considered safe. *Id.*

Thus, in this climate of increasing school violence and government oversight, and in light of schools' undisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours, we must conclude that the defendants did not violate Rachel's First Amendment rights. We can only imagine what would have happened if the school officials, after learning of Rachel's writing, did nothing about it and the next day Rachel did in fact come to school with a gun and shoot and kill her math teacher. In our view, it is imperative that school officials have the discretion and authority to deal with incidents like the one they faced in this case. Recently, in *Morse*, the Supreme Court broadly held that "[t]he special characteristics of the school environment and the governmental interest in stopping student drug abuse . . . allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." 551 U.S. ___, slip op. at 14 (quotation and citation omitted). That same rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence.

Just as there is no First Amendment right to falsely yell "fire" in a crowded theater, *see Schenck v. United States*, 249 U.S. 47, 52, 39 S. Ct. 247, 249 (1919),

13

or to knowingly make false comments regarding the possession of an explosive device while on board an aircraft, *see United States v. Rutherford*, 332 F.2d 444, 446 (2d Cir. 1964), there also is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day. To quote Justice Holmes in *Schenck*, "We admit that in many places and in ordinary times [Rachel] in saying all that was said . . . would have been within [her] constitutional rights. But the character of every act depends upon the circumstances in which it is done." 249 U.S. at 52, 39 S. Ct. at 249; *see also Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 504 (5th Cir. 2001) ("Visibly wearing a cross pin–religious speech that receives great protection in civilian life–takes on an entirely different cast when viewed in the context of a police uniform.").

Literary merit and technique notwithstanding, without doubt, Rachel's first-person narrative could reasonably be construed as a threat of physical violence against her sixth-period math teacher. That Rachel does not appear to have purposely disseminated the narrative is immaterial in this context. By taking the narrative to school and failing to exercise strict control over the notebook in which it was written, Rachel increased the likelihood to the point of certainty that the

14

narrative would be seen by others, whether by other students or a teacher. Consequently, Rachel created an appreciable risk of disrupting RHS in a way that, regrettably, is not a matter of mere speculation or paranoia. *See*, *e.g.*, Mark Bixler, *Cherokee School Acts on Threats; R.M. Moore Elementary Officials Say a Student Wanted to "Settle a Score,"* Atlanta J. & Const., May 30, 1998, at D1 (discussing an incident wherein an Atlanta-area elementary school student made a comment to a friend outside of school that he intended to bring a gun to school the next day and, as a result of quickly spreading rumors, 200 children were kept home from school notwithstanding the student's arrest). Thus, the defendants aptly demonstrated "that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509, 89 S. Ct. at 738.

Finally, we conclude that the plaintiffs are not entitled to any injunctive relief requiring the removal of the disciplinary record from Rachel's student education file. The plaintiffs fail to convince us that permanent documentation of the disciplinary action taken against Rachel, which did not itself violate her constitutional rights, could somehow violate her First Amendment rights. The district court's denial of injunctive relief, therefore, was not an abuse of discretion.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

BLACK, Circuit Judge, concurring:

Although I agree with the result, I would have limited the inquiry in this case to whether Rachel Boim's story and the circumstances surrounding it would cause school officials to reasonably anticipate a substantial disruption of or material interference "with the work of the school or impinge upon the rights of other students." *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 509, 89 S. Ct. 733, 738 (1969); *see also Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, __ F.3d __, No. 06-3394, 2007 WL 1932264, at *4 (2d Cir. April 17, 2007) (holding the *Tinker* standard applied to a student who transmitted a computer icon depicting a student shooting a named teacher).  Applying the *Tinker* standard, I concur.