# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 10-1428

_____

D.J.M., a minor child, by next friend,     *
D.M.; D.M., Father of D.J.M.; J.M.,     *
Mother of D.J.M.,     *
    *
     Plaintiffs - Appellants,     *
    *
        v.     *
    *
Hannibal Public School District #60;     *
Jill Janes,     *
    *
     Defendants - Appellees.     *

_____            Appeals from the United States
                            District Court for the Eastern
No. 10-1579           District of Missouri.

_____

D.J.M., a minor child, by next friend,     *
D.M.; D.M., Father of D.J.M.; J.M.,     *
Mother of D.J.M.,     *
    *
     Plaintiffs - Appellees,     *
    *
        v.     *
    *
Hannibal Public School District #60,     *
    *
     Defendant - Appellant,     *

Jill Janes,                                    *
                                               *
        Defendant.                             *
                          _____

                    Submitted: January 12, 2011
                      Filed: August 1, 2011
                          _____

Before MURPHY, BYE, and MELLOY, Circuit Judges.
                          _____

MURPHY, Circuit Judge.

        D.J.M., a student in the Hannibal Public School District #60 (the District), sent instant messages from his home to a classmate in which he talked about getting a gun and shooting some other students at school. The alarmed recipient and a trusted adult she had consulted contacted the school principal about their concerns. School authorities decided they must notify the police, who took a statement from D.J.M. that evening and then placed him in juvenile detention. D.J.M. was subsequently suspended for ten days and later for the remainder of the school year. His parents later brought this action under 42 U.S.C. § 1983, alleging that the District violated D.J.M.'s First Amendment rights. Both sides moved for summary judgment. The district court[1] granted summary judgment to the District on D.J.M.'s constitutional claims and remanded his state claim for administrative review. Both D.J.M.[2] and the District appeal. We affirm.

_____

        [1] The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

        [2] D.J.M., no longer a minor, brings this appeal himself but remains identified by his initials in the court docket. On his appeal he has not discussed the due process claim dismissed by the district court or its grant of qualified immunity to Superintendent Jill Janes.

-2-

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir. 2008). Our review is de novo, viewing the facts "in the light most favorable to the non-moving party." Id. In the context of a First Amendment claim, we must "make an independent examination of the whole record" to assure ourselves that "the judgment does not constitute a forbidden intrusion on the field of free expression." Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc). With this standard in mind we set out the background facts.

I.

D.J.M. attended school in the District for many years. According to school records, he did "very well" or had "good year[s]" in elementary and middle school. His parents home schooled D.J.M. in seventh and eighth grade, but he returned to the District in ninth grade in the 2005-2006 school year when he began attending Hannibal High School. While the record indicates that D.J.M. had a "goth" appearance or style which may have set him apart from some classmates, he did not have a history of threatening or violent conduct although he had participated in a mutual milk throwing incident with another student in ninth grade.

In the fall of 2006, D.J.M. was beginning his tenth grade year at the high school. He frequently communicated with his friends online by instant messaging.[3] After school D.J.M. would type messages into his home computer's instant messaging program and then send them in real time to a friend's home computer. His friends

---

[3] This type of communication has been referred to as student cyberspeech. See generally Kyle W. Brenton, Note, BONGHiTS4JESUS.COM? Scrutinizing Public School Authority over Student Cyberspeech Through the Lens of Personal Jurisdiction, 92 Minn. L. Rev. 1206, 1208 (2008).

would then type messages back. The record indicates that D.J.M. would send instant messages on a near daily basis to several of his friends, including C.M.

After school on October 24, D.J.M. sent instant messages from his home computer to several of his friends including C.M., who was also using her home computer. C.M. eventually became concerned about D.J.M.'s statements and emailed portions of what he had said to a trusted adult friend, Leigh Allen, and later to Principal Darin Powell. When Allen learned from C.M. about the content of their conversation, she advised C.M. to continue talking with D.J.M. Nine pages of C.M.'s conversation with D.J.M. were later recovered from D.J.M.'s computer.

The transcript of the retained portion of the instant message conversation begins with D.J.M. discussing his frustration at having recently been spurned by "L.," a romantic interest.[4] C.M. asks D.J.M. "what kidna gun did your friend have again?" D.J.M. responds "357 magnum." C.M. then replies, "haha would you shoot [L.] or let her live?" D.J.M. answers, "i still like her so i would say let her live." C.M. follows up by asking, "well who would you shoot then lol," to which D.J.M. responds "everyone else." D.J.M. then named specific students who he would "have to get rid of," including a particular boy along with his older brother and some individual members of groups he did not like, namely "midget[s]," "fags," and "negro bitches." Some of them "would go" or "woudl be going." C.M. later forwarded most of these statements to Allen by email.[5]

Throughout the conversation, D.J.M. and C.M. used forms of online shorthand. At several points they expressed amusement at the prospect of shooting particular

---

[4]Unless otherwise noted, all of D.J.M.'s statements to C.M. in this portion of their conversation were forwarded by email to either Leigh Allen or Principal Powell.

[5] Only D.J.M.'s statement that he would "have to get rid of a few negro bitches" was not sent to Allen.

individuals or groups by saying things like, "haha," "YAYAYYAY," and "lol." The record reflects that "lol" means the speaker is "laughing out loud." The conversation also touched on other topics including their music preferences, TV shows, body piercings, masturbation, and school classes. From time to time each person left the conversation to do other things.

C.M. became increasingly concerned about the threatening nature of many of D.J.M.'s messages, and without his knowledge she sent instant messages about them to Leigh Allen, an adult friend. C.M. told Allen she needed to talk about "something serious" because D.J.M. had been "talking about taking a gun to school" to "shoot everyone he hates [and] then shoot himself." C.M. also told Allen that D.J.M. "want[ed] to go to school and shoot up the kids he doesnt like and [who] are 'fags.'" C.M. explained that D.J.M. said he "want[ed] hannibal to be known for something" and that D.J.M. had been hospitalized and was "on all sorts of meds."

C.M. confided to Allen that she was "kinda scared" and that D.J.M. had "talked to a friend . . . [who] said he would give him a gun." Allen responded, "that's some serious stuff, [C.M.], you have to tell." C.M. told Allen that she did not know whether or not D.J.M. was "just depressed for one day" and was "just saying that cuz hes down." Allen asked C.M. to talk to D.J.M. again and determine "if he is serious or not." In Allen's words, "if the kid is bluffing that's one thing, but how would we feel if he isn't?" She was concerned enough herself to contact Principal Powell about the situation and later emailed Powell transcripts of her instant message conversation with C.M.

After reinitiating their online conversation, C.M. asked D.J.M. whether his nervousness "might have been the reason for what.. you wanting to like go shoot everyone??" D.J.M. responded: "wtf how did me shooting people at school come up into that [conversation]?" He then elaborated, "i still like [L.] and i don't want to do anything hurting or wrong to her." D.J.M. later commented that if he had a gun, a

particular named classmate "would be the first to die," but then said, "anyways I'm not going to do that[.] not anytime soon i feel better than i did earlier today." C.M. and D.J.M. continued to converse on other subjects. Meanwhile, C.M. returned to her conversation with Allen. After reading D.J.M's statements, Allen told C.M. that D.J.M. "sounds serious to me" and warned her to "watch what you say to him."

C.M. subsequently emailed Principal Powell excerpts of her conversation with D.J.M. In addition to forwarding portions of their online conversation, C.M. wrote:

> [D.J.M.] had told me earlier before I started saving the messages that he had a friend who had a gun that he could get. A revolver i think he said. He told me he wanted Hannibal to be known for something and that after he shot the people he didnt like he would shoot himself . . . . I asked him if he had a way to buy a gun and i asked if he had anyone old enough to get one for him and he said someone who was 21 could get one but he doesnt think he would buy it for him. . . .

After seeing the emails from Allen and C.M., Powell immediately called Jill Janes, the district superintendent. Janes and Powell agreed they should call the police and they did.

Police went to D.J.M.'s house on the same evening, October 24, interviewed him, and took him into custody. After he gave a voluntary statement, he was placed in juvenile detention that night and then referred by juvenile court to Lakeland Regional Hospital for a psychiatric examination. Subsequently he was evaluated at Hawthorn Psychiatric Hospital where he admitted he had contemplated suicide. When he was discharged from the hospital on November 28, he was returned to juvenile detention.

On October 31, one week after D.J.M. had been placed in juvenile detention, Powell and assistant principal Ryan Sharkey decided to suspend him for ten days.

Then on November 3, Superintendent Janes extended the suspension for the rest of the school year because D.J.M. had been placed in juvenile detention and his instant message conversation had had a disruptive impact on the school. Both Powell and Janes testified at the hearing before the school board that after word had spread in the school community about D.J.M.'s comments, Powell had received numerous phone calls from concerned parents asking what the school was doing to address D.J.M.'s threats and whether their children were on a rumored hit list. Powell testified that he increased campus security in several respects, including assigning staff to monitor entrances and public areas, limiting access to the school, and communicating these changes to parents. D.J.M. did not return to the high school until the following year, but graduated ahead of the rest of his class.

D.J.M.'s parents appealed his suspension to the school board. After according D.J.M. the type of due process procedures suggested in Goss v. Lopez, 419 U.S. 565, 584 (1975), the board found that D.J.M.'s actions had been "prejudicial to the good order and discipline in the Hannibal School District," having "caused significant disruption and fear," and that he had violated the student code of conduct which prohibited disruptive and threatening speech. Thereafter the board unanimously affirmed Janes's suspension of D.J.M. for the remainder of the 2006-07 school year.

D.J.M.'s parents subsequently brought this action in Missouri circuit court, alleging that his suspension had violated his First Amendment right to free speech and requesting administrative review of the board's decision under state law. They sought various types of relief, including an order rescinding the suspension of D.J.M., damages, and attorney fees. The District removed the case to the federal district court, which ultimately granted summary judgment in its favor. On the § 1983 claim the court held that D.J.M.'s speech had been an unprotected true threat and alternatively that the District could properly discipline him for his speech because of its disruptive impact on the school environment. The district court then remanded D.J.M.'s state law claim to the Missouri circuit court.

D.J.M. now appeals the district court's grant of summary judgment. He asserts that he had not intended to make any true threats and that his messages were not serious expressions of intent to harm. He also argues that his speech was not student speech because it was online outside of school. He claims that the school's decision to suspend him was a content based restriction violating the First Amendment. The District responds that D.J.M.'s statements, as reported very soon after they had been made, satisfied Doe's true threat test, see 306 F.3d at 624, that it had not been required to wait for an actual attack on others to notify the police, that his messages had been disruptive to the school community, and that it was justified in suspending him after he was placed in juvenile detention.

On its appeal, the District objects to the district court's denial of its motion for summary judgment on D.J.M.'s state law claim for administrative review of the Board's decision, arguing that that claim is now moot because D.J.M. has received his high school diploma. D.J.M. argues that the case is not moot because his suspension records are still part of his file, and even though confidential, they could be released either accidentally or as part of some future criminal or civil proceeding.

II.

A.

The Supreme Court has decided four leading cases involving student speech and the First Amendment, and their guidance is instructive even though the cases all arose either at school or at a school sponsored event. In the first, the Court decided that nondisruptive armbands worn by students with a message opposing the Vietnam War was protected under the First Amendment. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969). It pointed out that there was no evidence "that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other

students." Id. at 509. There had been nothing to cause school authorities to expect "substantial disruption of or material interference with school activities." Id. at 512. In each of the succeeding cases the Court started its analysis by referring to its decision in Tinker. In Bethel School District No. 403 v. Fraser, the Court determined that the First Amendment did not prevent school authorities from suspending a student who had given a vulgar and lewd assembly speech which could "undermine the school's basic educational mission." 478 U.S. 675, 686 (1986). The Court concluded in Hazelwood School District v. Kuhlmeier that reasonable restrictions on speech in a student newspaper and excisions to protect student privacy rights could reasonably be imposed without violating the First Amendment. 484 U.S. 260, 270 (1988). The Court contrasted the issue in Tinker, which it described as "whether the First Amendment requires a school *to tolerate* particular student speech" as opposed to the issue in Kuhlmeier, "whether the First Amendment requires a school affirmatively *to promote* particular speech." Id. at 270–71 (emphasis added). "So long as [educational] actions are reasonably related to legitimate pedagogical concerns," they will not violate the First Amendment. Id. at 273.

Finally in Morse v. Frederick, Chief Justice Roberts reviewed the Court's approach in these prior decisions before holding "that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." 551 U.S. 393, 397 (2007). At a class trip a student and his friends had opened a large banner in public stating "BONG HiTS 4 JESUS." The superintendent later testified that the banner's message promoted illegal drug use and was "clearly disruptive of and inconsistent with the school's educational mission." Id. at 398. The Court observed that "[s]chool principals have a difficult job, and a vitally important one," id. at 409, for they must react "on the spot" to unexpected events. Id. at 410. It concluded that the student's suspension did not violate the First Amendment because school authorities did not have to "to tolerate at school events student expression that contributes to those dangers [of illegal drug use]." Id.

In none of these cases was the Court faced with a situation where the First Amendment question arose from school discipline exercised in response to student threats of violence or for conduct outside of school or a school sanctioned event. Such cases have been brought in the lower courts, however, and the courts of appeal have taken differing approaches in resolving them. One line of cases centers on the concept of "true threats" derived from Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam), where a criminal conviction for threatening the President was reversed because the defendant's statement was found not to have been a true threat. The other line focuses on the substantial disruption issue identified in Tinker. And recently courts have been asked to apply First Amendment principles to situations arising from out of school instant messaging by students.

B.

The leading case in the Eighth Circuit dealing with a student threat arose from a letter written by a student outside of school. See Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616 (8th Cir. 2002) (en banc). A friend who had seen the letter told the girl to whom the letter was addressed about its contents and later took it to her in school where she read it during a gym class. The author of the letter was a fellow student and former boyfriend who expressed in his letter a "pronounced, contemptuous and depraved hate" for her and referred to her as a "'bitch,' 'slut,' 'ass,' and a 'whore.'" Id. at 625. The letter used graphic language and spoke about his desire "to sodomize, rape, and kill" her. Id. A student present while the girl read the letter immediately reported it to a school resource officer who went back to the gym where he found the girl "frightened and crying." Id. at 620. After a school administrator learned about the letter, its author was suspended. "[I]n the wake of Columbine and Jonesboro," our court found it "untenable" that school officials learning about the letter "would not have taken some action based on its violent and disturbing content." Id. at 626 n.4. Since the letter contained true threats, expulsion of the student did not violate the First Amendment.

-10-

*Doe* defined a true threat as a "statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." *Doe*, 306 F.3d at 624. The speaker must in addition have intended to communicate his statement to another. Id. That element of a true threat is satisfied if the "speaker communicates the statement to the object of the purported threat *or to a third party*." Id. (emphasis added).

Here, the district court concluded that D.J.M. "had the requisite intent to communicate his threat because he communicated his statements to [C.M.]," and that he "should have reasonably foreseen that his statements would have been communicated to his alleged victims" since a reasonable person should be aware that electronic communications can now be easily forwarded. Although D.J.M. did not communicate any threatening statements to the teenagers targeted in his messages, he intentionally communicated them to C.M., a third party. Since C.M. was a classmate of the targeted students, D.J.M. knew or at least should have known that the classmates he referenced could be told about his statements. See id. at 624.

D.J.M. contends that *Doe*'s statement, that the intent to communicate element of a true threat is satisfied if the speaker communicates with a third party about it, was dicta because the student author there had actually "discussed the letter in more than one phone conversation with [the victim]." *Doe*, 306 F.3d at 625. It was a third party who took the letter to her, however, permitting her to see all of its detail, causing her to cry, and bringing it to the attention of a school official. Id. at 612–20. D.J.M. also relies on Porter v. Ascension Parish School Board, 393 F.3d 608 (5th Cir. 2004), cert. denied, 544 U.S. 1062 (2005), to support his position that he had not intended to communicate any threat.

The facts in Porter are quite different than in D.J.M.'s case. In Porter, a student had drawn a sketch at home showing his school under attack "by a gasoline tanker truck, missile launcher, helicopter, and various armed persons." Porter, 393 F.3d at

-11-

611. Instead of communicating it to anyone at school, he put the sketch pad in a closet where it remained for two years until found by his brother and "unwittingly" taken to school. Id. at 615. The Fifth Circuit concluded that "because [the student's] drawing cannot be considered a true threat as it was not intentionally communicated, the state was without authority to sanction him for the message it contained. Id. at 618. In contrast, D.J.M. intentionally sent his messages to his classmate C.M. who transmitted them to the school authorities shortly after they were made. Since D.J.M. intentionally communicated his threats to C.M., a third party, the district court did not err in finding that they were true threats.

D.J.M. also argues that the district court erred in concluding that he had raised no genuine fact issues as to whether a reasonable recipient would view his instant messages as serious expressions of intent to harm. He asserts that his instant messages were made in jest out of teenage frustration and in response to "goading" by C.M. The district court concluded that D.J.M.'s statements, when viewed in their entirety, were true threats not subject to First Amendment protection. It based this conclusion on his admission that he was depressed at being rejected by a romantic interest; his "access to weapons" which made his threats "believable"; C.M.'s report that D.J.M. said he intended to take a gun to school to shoot everyone he hates and then himself; his expressed "desire to kill at least five classmates"; his telling C.M. he "wanted Hannibal to be known for something"; and C.M.'s growing concern that caused her to contact a trusted adult about his threats. These conclusions were based on the record, and D.J.M. has not shown that they were erroneous.

In another Eighth Circuit case involving student speech, Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir. 2008), we affirmed a summary judgment in favor of school officials. We held that a student's graphic essay had been an unprotected true threat. He had "expressed, in graphic terms, a plan to kill [his English teacher] and himself." Riehm, 538 F.3d at 964. The murder had been described "in gruesome detail, including shattering [the teacher's] eye with a bullet and licking her blood from

-12-

[the student's] lips." Id. The essay's hate filled "obsession with weapons and gore" and its description of her murder and his suicide led "to the inescapable conclusion that it was a serious threat." Id.

There is much in this case similar to Riehm. Here, the speaker also mentioned suicide in connection with a potential school shooting. D.J.M. identified a specific type of gun he could use and listed a number of specific individuals he planned to shoot. In his words, one girl "woudl be going" while he would "let [a different girl] live." He wrote that he would "have to get rid of a few negro bitches" and that if he had a gun, another classmate would "be the first to die." Combined with his admitted depression, his expressed access to weapons, and his statement that he wanted Hannibal "to be known for something," we find no genuine dispute of material fact regarding whether his speech could be reasonably understood as a true threat.

Both here and in the district court, D.J.M. argued that the emails C.M. and Allen sent to Powell contained inadmissible hearsay to the extent they contained statements not in the transcript recovered from his own computer.[6] The district court held these statements admissible under the "state of mind" exception to the hearsay rule. Federal Rule of Evidence 803(3) provides that a statement of the declarant's "then existing state of mind" is not excludable hearsay. The district court concluded that C.M.'s statements were relevant to "whether her reaction and state of mind were that of a 'reasonable person.'" C.M.'s email to Powell relating that D.J.M. had said he "wanted Hannibal to be known for something" shows her concern that he was serious about committing violent acts at school, a relevant factor for the District to

---

[6] D.J.M. also argues that statements he voluntarily made to the police are "confidential and privileged" under state law. See Mo. Rev. Stat. § 211.271 Subd. 3. We focus on his internet transmissions and the related emails sent by C.M. and Allen and need not consider whether his statement to the police would be admissible under federal law. The District's actions were not based on that statement which was inadvertently produced during discovery after this case was filed.

-13-

consider in determining an appropriate response. Allen's statement that D.J.M. "sounds serious to me" is admissible for the same reason. See Curtis Lumber Co., Inc. v. La. Pac. Corp., 618 F.3d 762, 783 n.18 (8th Cir. 2010) (statements admissible because they "show[ed] the effect of the out-of-court statements on the listener").

D.J.M. also argues that there was a genuine issue of material fact as to whether his statements were sufficiently serious to be perceived as a true threat. He points to factors discussed in two criminal cases, Watts and United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir.), cert. denied, 519 U.S. 1043 (1996). In Watts, the Supreme Court reversed a conviction for threatening the president where the defendant had stated, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394 U.S. at 706. The Court looked to three factors in holding that the statement was not a true threat: its context, its "expressly conditional nature," and the reaction of the listeners. Id. at 708. In Dinwiddie, we discussed additional factors: "whether the threat was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim in the past, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence." Dinwiddie, 76 F.3d at 925 (citations omitted). D.J.M. argues that, like the crowd in Watts, the "listener" here (C.M.) reacted by "laughing out loud" and points to his failure to communicate any threats directly to his victims, his lack of a history of violence, and his statements that he would not act "anytime soon."

We disagree. The record here does not reveal any genuine dispute of material fact on the controlling question presented: whether a "reasonable recipient would have interpreted [D.J.M.'s statements] as a serious expression of an intent to harm or cause injury to another." Doe, 306 F.3d at 624. D.J.M.'s references to targeted classmates as "midget[s]," "fags," and "negro bitches" are hate filled comments. His statements that five specific named individuals "would go" or "would be the first to die" were real cause for alarm, especially since he talked about using a 357 magnum that could be borrowed from a friend. The reaction of those who read his messages

-14-

is evidence that his statements were understood as true threats. C.M. contacted Allen, a trusted adult, to discuss what in her words was "something serious." When Allen saw D.J.M.'s messages, she wrote that this was "serious stuff," that D.J.M. "sounds serious to me," and contacted Powell. After Powell and superintendent Janes learned of the statements, they were concerned enough to contact the police. Despite D.J.M.'s assertion that his instant messages were intended as a joke, a juvenile court judge thought the situation serious enough to order him admitted to Lakeland Regional Hospital for psychiatric evaluation. The record does not reveal that any person who became aware of D.J.M.'s speech thought he was joking.

True threats are not protected under the First Amendment, and here the District was given enough information that it reasonably feared D.J.M. had access to a handgun and was thinking about shooting specific classmates at the high school. In light of the District's obligation to ensure the safety of its students and reasonable concerns created by shooting deaths at other schools such as Columbine and the Red Lake Reservation school, the district court did not err in concluding that the District did not violate the First Amendment by notifying the police about D.J.M.'s threatening instant messages and subsequently suspending him after he was placed in juvenile detention.

The First Amendment did not require the District to wait and see whether D.J.M.'s talk about taking a gun to school and shooting certain students would be carried out. Compare Morse, 551 U.S. at 410. Because the District had reason to be alarmed upon hearing the almost contemporaneous concerns brought to it by another student and a trusted adult, it appropriately intervened by referring the matter to the police. After volunteering a statement to the police, D.J.M. was placed in juvenile detention and a juvenile court judge ordered him admitted to a hospital for psychological evaluation. Several days after these events, and only after the school environment had been disrupted by rumors about D.J.M.'s instant messages, school officials suspended him for ten days. Based on D.J.M.'s placement in juvenile

-15-

detention as well as his referral to a psychiatric hospital and the ongoing disruption his statements caused as they became known in the school community, Superintendent Janes extended his suspension for the remainder of the year.

The District afforded D.J.M. a full due process hearing to challenge his suspension, after which the school board concluded that his actions had violated the student code of conduct by causing "significant disruption and fear." The undisputed facts here show that school officials would have exposed the District to what reasonably appeared to them as a serious risk of harm to students and disruption of the school environment if no action had been taken in response to D.J.M.'s threatening instant messages which met our court's test for true threats. Viewing the entire factual circumstances surrounding D.J.M.'s statements and the District's awareness of recent school shootings, Doe, 306 F.3d at 626 & n.4, we conclude it did not violate the First Amendment by notifying the police of D.J.M.'s threatening messages and later suspending him.

C.

In addition to the line of school cases which used a true threat analysis to decide the First Amendment issues raised, there is another line which uses a substantial disruption analysis based on the Supreme Court's Tinker decision. Of particular interest here is Wisniewski v. Weedsport Central School District, 494 F.3d 34, 36 (2d Cir. 2007), which like the instant case involved student instant messaging outside of school which threatened deadly acts inside it. The widespread use of instant messaging by students in and out of school presents new First Amendment challenges for school officials. Instant messaging enables student messages to be rapidly communicated widely in school and out. School officials cannot constitutionally reach out to discover, monitor, or punish any type of out of school speech. When a report is brought to them about a student threatening to shoot specific students at school, however, they have a "difficult" and "important" choice

to make about how to react consistent with the First Amendment. See Morse, 551 U.S. at 409.

The Court in Tinker explained that "in class *or out of it*," 393 U.S. at 513 (emphasis added), conduct by a student which "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" is not "immunized by the First Amendment." Id. at 514. Since student armbands expressing opposition to the Vietnam War were not disruptive to the school environment there, they were protected by the First Amendment. The Court has subsequently described its holding in Tinker as prohibiting school officials from suppressing student speech without reasonably concluding that the speech "materially and substantially disrupt[s] the work and discipline of the school." Morse, 551 U.S. at 404.

In Wisniewski, a student sent outside of school an instant message to some friends, portraying an icon with a pistol shooting a bullet and text about killing his English teacher. Another student discovered it and took it to the English teacher. School authorities notified the police, suspended the student, and proposed a long term suspension. See Wisniewski, 494 F.3d at 37–38. In deciding whether the student's First Amendment rights had been violated the Second Circuit chose not to "pause to resolve" whether the student's internet transmission was a true threat, for it considered the Tinker standard to be the more appropriate test. Id. at 36. There was no dispute that the messages had in fact reached the school and the panel unanimously agreed that it had been "reasonably foreseeable that the [instant messaging] icon would come to the attention of the school authorities and the teacher" and that it would "create a risk of substantial disruption within the school environment." Id. at 39–40 & n.4. The First Amendment claim had therefore been properly dismissed.

The Eleventh Circuit also used the Tinker standard to decide Boim v. Fulton County School District, 494 F.3d 978 (11th Cir. 2007), a case involving a student essay which described a dream about shooting her math teacher. It was discovered at school where she was seen passing it to another student. In deciding her family's First Amendment claims the court ruled that the student had "clearly caused . . . a material and substantial disruption" to the school. Id. at 983. It commended the school authorities for "acting quickly to prevent violence on school property" since it could "only imagine what would have happened if the school officials . . . did nothing about it and the next day [the student] did in fact come to school with a gun and shoot and kill" her intended target, drawing an analogy from Morse. Id. at 984. Judge Black wrote in concurring that the appropriate phrasing of the test was whether the facts "would cause school officials to reasonably anticipate substantial disruption of or material interference with" the work of the school. Id. at 985, citing Tinker, 393 U.S. at 509.

In D.J.M.'s case, the District's alternative argument before the district court was also based on Tinker. It argued that its actions had not violated the First Amendment because D.J.M.'s instant messages had caused substantial disruption in the school. Parents and students had notified school authorities expressing concerns about student safety and asking what measures the school was taking to protect them. They asked about a rumored "hit list" and who had been targeted. School officials had to spend considerable time dealing with these concerns and ensuring that appropriate safety measures were in place. The district court concluded that the school had been "substantially disrupted because of Plaintiff's threats," citing Tinker, and granted summary judgment to the District on this basis also. After thoroughly reviewing the record, we agree with that conclusion. Here, it was reasonably foreseeable that D.J.M.'s threats about shooting specific students in school would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment.

D.

One of the primary missions of schools is to encourage student creativity and to develop student ability to express ideas, but neither can flourish if violence threatens the school environment. School authorities as well as the courts are called on to protect free expression under the First Amendment in a variety of circumstances. While the Supreme Court recently struck down a law restraining the sale or rental of violent video games to minors on First Amendment grounds, see Brown v. Entm't Merch. Ass'n, (June 27, 2011), it has acted more cautiously in First Amendment school cases, as evidenced by its policy concerns about avoiding any substantial disruption to the school environment (Tinker), lewd and offensive student speech (Fraser), and student speech supporting illegal drugs (Morse). The Court has not yet had occasion to deal with a school case involving student threats or one requiring it to decide what degree of foreseeability or disruption to the school environment must be shown to limit speech by students. These cases present difficult issues for courts required to protect First Amendment values while they must also be sensitive to the need for a safe school environment.

III.

Both D.J.M. and the District argue that the district court erred in remanding D.J.M.'s state law claim for administrative review to state court. D.J.M. argues that the district court abused its discretion in failing to exercise supplemental jurisdiction since that claim was only remanded on the eve of trial after discovery had been completed and the issues had been fully briefed. Moreover, he argues, the federal and state claims share a "common nucleus of law and fact" with no novel or complex state law issues. In its cross appeal, the District argues that remanding the state law claim after D.J.M. had served his suspension was an abuse of discretion because that claim is now moot since D.J.M. has received his diploma.

The district court held that the controversy was not moot because, though some procedural protections were in place, disclosure of D.J.M.'s "disciplinary past" remained possible, for example as "part of [a] criminal investigation or case." It remanded the case to state court after concluding that it "only ha[d] federal claim jurisdiction pursuant to Plaintiff's dismissed 42 U.S.C. § 1983 claim." We review a district court's decision not to exercise supplemental jurisdiction over a pendent state law claim for abuse of discretion. See, e.g., Shuler ex rel. Shuler v. Springfield R-XII Sch. Dist., 332 F. App'x 358, 359 (8th Cir. 2009).

The district court did not abuse its discretion in remanding D.J.M.'s state law claim to Missouri state court. After the district court entered summary judgment on D.J.M.'s § 1983 claim, it had effectively "dismissed all claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(3). That it did so after the issues had been briefed and discovery completed does not affect our conclusion. See Annulli v. Panikkar, 200 F.3d 189, 202–03 & n.13 (3rd Cir. 1999), overruled on other grounds, Rotella v. Wood, 528 U.S. 549 (2000), and cases cited.

Neither was it an abuse of discretion not to dismiss the state law claim as moot, even if D.J.M. has since received his diploma. Although the District's policy is not to disclose a student's disciplinary records to any employer or institute of higher learning, it may still be possible to obtain D.J.M.'s disciplinary records as part of a criminal investigation or other civil proceeding. It was thus not an abuse of discretion to remand D.J.M.'s state law claim for administrative relief to state court.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

_____

-20-