Judge POOLER dissents in a separate opinion.
WINTER, Circuit Judge:
William and Margaret Cuff appeal from Judge Rakoffs grant of summary judgment dismissing their complaint brought on behalf of their minor son B.C. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 714 F.Supp.2d 462 (S.D.N.Y.2010). Their appeal concerns the contours of B.C.’s First Amendment rights and the regulation of his speech in school. We affirm.
BACKGROUND
Because this is an appeal from a grant of summary judgment, we view the facts in the light most favorable to appellants and *111 resolve all disputes of fact in their favor. Mathirampuzha v. Potter, 548 F.3d 70, 72-73 (2d Cir.2008).
Briefly stated, this litigation arises out of a crayon drawing by B.C. in response to an in-class assignment. The drawing depicted an astronaut and expressed a desire to “[b]low up the school with the teachers in it.” At the time, September 2007, B.C. was ten years old and a fifth-grade student at Berea Elementary School in Montgomery, New York.
In January 2006, prior to creating the astronaut drawing, B.C. had drawn another picture that was perceived by the school staff as disturbing. The drawing depicted a person firing a gun, and above it, B.C. had written: “One day I shot 4 people each of them got fo[ur] blows + they were dead. I wasted 20 bulits [sic] on them.” B.C.’s teacher alerted the school psychologist, Delaine Charette, to the drawing, and school officials contacted B.C.’s parents. B.C. said that he was portraying a game of paintball in the drawing.
In the spring of 2007, as part of a fourth grade in-class assignment, B.C. wrote a story about “a big wind [that] destroyed every school in America.... [And] every body ran for there [sic] life and than [sic] all adults died and all the kids were alive. Than [sic] all the kids died.” This story was also reported to Charette, although she did not speak with B.C. about it.
Prior to September 2007, B.C. had also been disciplined by teachers and school administrators for misbehavior in and around school. B.C. testified that he had been to Principal Knecht’s office and Assistant Principal Malley’s office on a few occasions prior to the astronaut drawing incident. Kneeht and Malley also confirmed B.C.’s involvement in numerous altercations during recess, pushing and shoving in the hallways, and rough play at school.
The precise circumstances involving the creation of the astronaut drawing are as follows. On September 12, 2007, B.C.’s science teacher, Tara DeBold, asked her students to fill in a picture of an astronaut and write various things in various sections of the astronaut. The students were instructed to write a “wish” in the left leg of the astronaut. B.C. testified that DeBold told the students that “you can write, like, anything you want ... you can involve a missile ... [y]ou can write about missiles.” In that spot, B.C. wrote his “wish”: “Blow up the school with the teachers in it.”
At this time, B.C. was seated at a block of six desks pushed together. B.C. told his nearby classmates what he was going to write in the picture, and the students laughed in response. C.P., a female student who was sitting in a neighboring group of desks, heard from another student about what B.C. drew, and went to look at B.C.’s picture. B.C. said that C.P. laughed at it. C.P. then approached DeBold — who perceived C.P. to be “very worried” — and told the teacher about the drawing. DeBold then approached B.C. and asked him if he meant what he had written. B.C. looked at DeBold with a blank and serious face. DeBold then sent B.C. to Principal Knecht’s office.
Principal Kneeht and Assistant Principal Malley asked B.C. if he meant what he had written in the drawing. B.C. testified that he told, them that he did not mean what he had written. Kneeht then called Superintendent Richard Hooley for advice regarding B.C.’s punishment. Kneeht summarized for Hooley the events that had occurred, B.C.’s history of misbehavior in school, and her concerns that B.C. had frightened C.P. Hooley stated that suspension was appropriate.
*112 At the end of the meeting, Knecht and Malley asked B.C. to sign a document consisting of Knecht’s notes transcribed during the meeting. Although B.C. testified that he could not read the script handwriting, he signed the document. Later that afternoon, Knecht met with B.C. and his parents. During the meeting, B.C. stated that he did not mean what he had written in the astronaut drawing and that he was only kidding.
Following the meeting with B.C.’s parents, Knecht confirmed in writing that B.C. was to be suspended for five days out of school and one day in school based on the “wish.”
Appellants appealed the suspension to the District’s Board of Education. The Board upheld the suspension, and the Cuffs did not appeal to the New York State Commissioner of Education. Appellants then brought the present Section 1983 action on behalf of B.C., alleging that by suspending B.C., the District and Knecht violated B.C.’s First Amendment right to freedom of expression. Appellants also alleged that appellees imposed an excessive punishment in disciplining B.C. as a result of the astronaut drawing.
The late Judge Conner, to whom this case was first assigned, granted appellees’ motion to dismiss for failure to state a claim. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. (“Cuff I”), 559 F.Supp.2d 415, 424 (S.D.N.Y.2008). Appellants appealed, and we vacated and remanded, holding that, without some context, the facts alleged in the complaint did not dictate a Fed.R.Civ.P. 12(b)(6) dismissal. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. (“Cuff II”), 341 Fed.Appx. 692, 693 (2d Cir.2009) We noted, in particular, that the facts, as alleged, indicated that only the teacher saw B.C.’s “wish” and that B.C. had no disciplinary history. Id. On remand, the parties completed discovery, and appellees moved for summary judgment. Judge Rakoff, to whom the case was reassigned following the death of Judge Conner, granted the motion. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. (“Cuff III”), 714 F.Supp.2d 462, 463 (S.D.N.Y.2010). We affirm.

DISCUSSION

“We review a district -court’s grant of summary judgment de novo.” See Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir.2008).
a) Legal Standards
Public school students are protected by the First Amendment and do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Nonetheless, “the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment.” Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal quotation marks and citation omitted). Student speech may be curtailed if the speech will “materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.” Tinker, 393 U.S. at 509, 89 S.Ct. 733 (internal quotation marks omitted). School authorities may suppress student speech to prevent material disruption in the schools, when they have more than an “undifferentiated fear or apprehension of disturbance” and can show that their action “was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an *113 unpopular viewpoint.” Id. at 508, 509, 89 S.Ct. 733.
In applying Tinker, we have held that “the relevant inquiry is whether ‘the record ... demonstrate^] ... facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.’ ” DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 78 (2d Cir.2010) (quoting Tinker, 393 U.S. at 514, 89 S.Ct. 733) (alterations in original). This test does not require school administrators to prove that actual disruption occurred or that substantial disruption was inevitable. Rather, the question is “whether school officials might reasonably portend disruption from the student expression at issue.” Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir.2008) (internal quotation marks omitted). As the district court in Cuff III stated, “an actual disruption standard would be absurd.” 714 F.Supp.2d at 469.
The test is an objective one, focusing on the reasonableness of the school administration’s response, not on the intent of the student. See Tinker, 393 U.S. at 514, 89 S.Ct. 733 (holding that the objective reasonableness of the school administrator’s response, not the student’s intentions, is relevant); Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 40 (2d Cir.2007) (holding that a student’s generation and transmission of an internet “buddy icon” from his parent’s home computer supports a reasonable probability of substantial disruption at the school and permitting school discipline “whether or not [the student] intended [the speech] to be communicated to school authorities or, if communicated, to cause a substantial disruption”); Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 767, 772 (5th Cir.2007) (holding that a high-school student’s violent story depicting a school shooting was not constitutionally protected, despite the student’s claim that he meant it as a work of fiction and not a threat); Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 981, 984-85 (11th Cir.2007) (same).
Finally, in the context of student speech favoring violent conduct, it is not for courts to determine how school officials should respond. School administrators are in the best position to assess the potential for harm and act accordingly. See Wisnieioski, 494 F.3d at 40 (“[W]e are mindful that ‘[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.’ ”) (quoting Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)); see also Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (“[I]t is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse” and “[t]he determination of what manner of speech in the classroom ... is inappropriate properly rests with the school board.”).
b) Application
Applying these standards to B.C.’s conduct, we conclude that his suspension must be upheld. In Cuff II, we remanded because, inter alia, there were allegations that B.C. “did not show the [astronaut drawing] to any classmates but rather handed it directly to his teacher[,] and B.C. had no other disciplinary history that would suggest a violent tendency.” 341 Fed.Appx. at 693.
The record now before us demonstrates that it was reasonably foreseeable that the astronaut drawing could create a substantial disruption at the school. When B.C. was suspended, he had a history of *114 disciplinary issues, and his other earlier drawings and writings had also embraced violence. Prior to the astronaut drawing incident, Malley discussed B.C.’s other drawings and writings with Knecht, expressing a “concern” for the student, and school psychologist Charette testified that she had spoken with Knecht about B.C.’s disciplinary issues and prior drawings. In addition, the astronaut drawing was seen by other students in the class, and caused C.P., who observed B.C. with the drawing, to leave her seat and bring it to DeBold’s attention. DeBold perceived C.P. to be “very worried” about the drawing.
Whether B.C. intended his “wish” as a joke or never intended to carry out the threat is irrelevant. Nor does it matter that B.C. lacked the capacity to carry out the threat expressed in the drawing. See Wisniewski, 494 F.3d at 36, 40 (affirming summary judgment in favor of school administrators for regulating student’s speech even though the student protested that his creation of the “buddy icon” was only meant as a joke); see also Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616 (8th Cir.2002) (“In determining whether a statement amounts to an unprotected threat [under the First Amendment], there is no requirement that ... the speaker was capable of carrying out the purported threat of violence.”).
Courts have allowed wide leeway to school administrators disciplining students for writings or other conduct threatening violence. See, e.g., Boim, 494 F.3d at 981, 984 (finding that school officials did not violate a student’s First Amendment rights when they suspended her for writing a narrative depicting her shooting her math teacher); Ponce, 508 F.3d at 772 (analyzing, under Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), a student’s speech threatening a “Columbine shooting attack” on a school, and finding that “such specific threatening speech to a school or its population is unprotected by the First Amendment” because “[s]chool administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.”); Pulaski Cnty. Special Sch. Dist., 306 F.3d at 626 n. 4 (finding it “untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of [the student’s letter in which he described how he would rape and murder a classmate] would not have taken some action based on its violent and disturbing content,” and holding that the letter constituted a “true threat” under Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)); LaVine v. Blaine Sch. Dist., 257 F.3d 981, 983, 987, 992 (9th Cir.2001) (evaluating “the recent spate of school shootings,” the “potential for school violence,” and the “care when evaluating a student’s First Amendment right of free expression against school officials’ need to provide a safe school environment,” and holding that the school did not violate a student’s First Amendment’s rights when it expelled him for his poem filled with imagery of violent death and suicide and shooting of fellow students).
The threat of substantial disruption was aggravated by B.C.’s sharing of his “wish” with fellow students, an act reasonably perceived as an attention-grabbing device. School administrators might reasonably fear that, if permitted, other students might well be tempted to copy, or escalate, B.C.’s conduct. This might then have led to a substantial decrease in discipline, an increase in behavior distracting students and teachers from the educational mission, *115 and tendencies to violent acts.[1] Such a chain of events would be difficult to control because the failure to discipline B.C. would give other students engaging in such behavior an Equal Protection argument to add to their First Amendment contentions.
School administrators also have to be concerned about the confidence of parents in a school system’s ability to shield their children from frightening behavior and to provide for the safety of their children while in school. B.C.’s “wish,” being known by many students, could easily have become known to a number of parents who could reasonably view it as something other than a contribution to the marketplace of ideas. While parents do not have the right to monitor student speech, they could reasonably be concerned about the safety of their children in the present circumstances. A failure of the appellees to respond forcefully to the “wish” might have led to a decline of parental confidence in school safety with many negative effects, including, e.g., the need to hire security personnel and even a decline in enrollment.
Thus, appellees could reasonably have concluded that B.C.’s astronaut drawing would substantially disrupt the school environment, and their resulting decision to suspend B.C. was constitutional.
Appellants also argue that B.C.’s punishment was excessive under the First Amendment. The appropriate degree of punishment is of course a matter in which we show the greatest deference to school authorities. Wood, 420 U.S. at 326, 95 S.Ct. 992. It suffices to say that we see no merit to this argument.
CONCLUSION
For the foregoing reasons, we affirm.

. As one Court of Appeals has already expressed, confronting a threat of school violence may be appropriate given the recent wave of school shootings that have tragically affected our nation: "[a]fter [all the] school shootings, questions have been asked about how teachers and administrators could have missed telltale 'warning signs,’ why something was not done earlier and what should be done to prevent such tragedies from happening again.” LaVine, 257 F.3d at 987.